# UNITED STATES *v.* BAUSCH & LOMB OPTICAL CO. ET AL.

NO. 62.

Argued December 8, 1943.—Decided April 10, 1944.

708

*Assistant Attorney General Berge,* with whom *Solicitor General Fahy* and *Mr. Charles H. Weston* were on the brief, for the United States.

*Mr. Whitney North Seymour,* with whom *Mr. Richard B. Persinger* was on the brief, for the Bausch & Lomb Optical Co. et al., appellees in No. 62; and *Mr. Bethuel M. Webster* for the Soft-Lite Lens Co. et al., appellees in No. 62 and appellants in No. 64.

MR. JUSTICE REED delivered the opinion of the Court.

The United States of America brought suit in the District Court for the Southern District of New York against the Bausch & Lomb Optical Company, a corporation, and the Soft-Lite Lens Company, Inc., and several of the chief officers of each, to restrain violations of the Sherman Act. Jurisdiction was conferred on the trial court by § 4 of the Act (15 U. S. C. § 4) and upon this Court by § 2 of the

Act of February 11, 1903 (15 U. S. C. § 29 and Judicial Code § 238).

The complaint alleged that Bausch & Lomb and Soft-Lite and their officers contracted, combined and conspired to restrain trade in pink tinted lenses for eyeglasses, contrary to §§ 1 and 3 of the Sherman Act.[1] The allegations of the complaint were upheld by the trial court as to Soft-Lite and certain of its officers and dismissed as to Bausch & Lomb and its officers. *United States* v. *Bausch & Lomb Optical Co.,* 45 F. Supp. 387.

The findings and opinion upon which the decree is molded show that Soft-Lite is the sole distributor of pink

---

[1] 26 Stat. 209, as amended, 50 Stat. 693:

"Section 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal: *Provided,* That nothing herein contained shall render illegal, contracts or agreements prescribing minimum prices for the resale of a commodity which bears, or the label or container of which bears, the trade mark, brand, or name of the producer or distributor of such commodity and which is in free and open competition with commodities of the same general class produced or distributed by others, when contracts or agreements of that description are lawful as applied to intrastate transactions, under any statute, law, or public policy now or hereafter in effect in any State, Territory, or the District of Columbia, in which such resale is to be made, or to which the commodity is to be transported for such resale, and the making of such contracts or agreements shall not be an unfair method of competition under section 5, as amended and supplemented, of the Act entitled 'An Act to create a Federal Trade Commission, to define its powers and duties, and for other purposes,' approved September 26, 1914: *Provided further,* That the preceding proviso shall not make lawful any contract or agreement, providing for the establishment or maintenance of minimum resale prices on any commodity herein involved, between manufacturers, or between producers, or between wholesalers, or between brokers, or between factors, or between retailers, or between persons, firms, or corporations in competition with each other. . . ."

Section 3 governs similar conduct in territories of the United States and the District of Columbia.

tinted lenses sold under the trade name "Soft-Lite." Their plan of dealing follows. As no patents or secret processes are relied upon and as Soft-Lite limits itself to distribution only, the trade name, salesmanship and business experience of Soft-Lite are the qualities upon which it must primarily depend for its profits as a distributor. Soft-Lite buys its lenses from Bausch & Lomb. It sells to wholesalers, who in turn sell to retailers, who in turn sell to the public. Laying aside the variations in operating costs of wholesalers as compared with other wholesalers and of retailers as compared with other retailers, the opportunity for profits which can be divided between Soft-Lite, the wholesalers and the retailers, depends upon the difference between the price per lens that Soft-Lite pays Bausch & Lomb and the price the ultimate consumer pays the retailer. A wider spread between original purchase and final prices, which is maintained by artificial fixing of the prices demanded from the ultimate consumer, furnishes the links of the distribution chain more profit for division among themselves. This is true regardless of volume or price although these factors, of course, affect the aggregate profits available for division among the dealers who have a part in distribution. In its self-restricted field, Soft-Lite is successful. Roughly speaking, for the years 1938, 1939 and 1940 in the United States it has sold one-third of the pink tinted lenses for one-half of the gross receipts. Other manufacturers than Bausch & Lomb and other distributors than Soft-Lite do the remainder of the business.

Soft-Lite has arrangements with Bausch & Lomb for the purchase from them of lenses and blanks, with wholesalers of optical glass for the supply of this material to retail opticians, and in turn with these retailers for sales promotion. This is an integrated plan for the distribution of Soft-Lite's optical specialty, the pink tinted glass for easing eye strain. The plan of distribution for this

commodity has developed over more than a quarter of a century of experience.

The arrangement with Bausch & Lomb had its origin in 1924. At that time this manufacturer of optical glass undertook to grind pink tinted lenses for Soft-Lite out of foreign glass imported by the latter, but very soon the two parties arranged for Bausch & Lomb to manufacture the glass as well. At the very beginning Bausch & Lomb agreed that any orders for pink tinted lenses which it might receive would be transmitted to Soft-Lite. A list of Soft-Lite customers, wholesale and retail, was furnished Bausch & Lomb. It appeared better to both seller and buyer to extend their arrangement by a contract in which Bausch & Lomb undertook to manufacture and sell pink tinted glass and lenses to Soft-Lite. To avoid the danger to Soft-Lite's business of indiscriminate selling by Bausch & Lomb of this pink glass specialty, Bausch & Lomb agreed that it would not sell pink tinted glass to lens manufacturers or pink tinted lenses to the optical trade. Soft-Lite buys exclusively from Bausch & Lomb.

The legal position of Bausch & Lomb and Soft-Lite is that of buyer and seller. Their relations through the years have been close, friendly and mutually satisfactory. Bausch & Lomb knows generally of the Soft-Lite distribution system, both as manufacturer for an active customer and as an owner of stock in wholesale optical goods companies, which subsidiary companies handled a large part of Soft-Lite's goods as jobbers. The officials of the two corporations carried on discussions and correspondence with respect to wholesale customers, retail outlets, prices, advertising policies, the standing of dealers, and general trade information. As to trade adjuncts for optical glass distribution such as cleaning cloths, lens cabinets, etc., Soft-Lite and Bausch & Lomb cooperated even to the ex-

tent of agreeing to charge identical prices for such marketing aids.

In 1926, the arrangement between Bausch & Lomb and Soft-Lite was given a somewhat more formal character by a letter of the manufacturer advising its customer as follows:

"Since the very beginning of our relations with you, in connection with this transaction, it has been understood that we would safeguard your interests in every way and it has never been our intention to make competition for you by either marketing a tinted lens of our own or producing similar tinted glass for other manufacturers and it is our intention to abide by this understanding.

"On the other hand, however, it is difficult to foresee the progress of science in producing glass possessing better properties than is obtainable at the present time and in that event we feel certain that you would not in any way desire to impede our progress in that direction.

"We hope that this may be sufficient guarantee to you that we do not wish to do anything that would look like competition in connection with the Soft-Lite and we naturally expect that your efforts in the sale of same will be continued as at present for an indefinite period unless by consent of both parties concerned a different arrangement is agreed upon.

Yours very truly,

BAUSCH & LOMB OPTICAL COMPANY.

"P. S. Tinted lenses such as Crookes, Fieuzal, Smoke, Amber, etc. which we are now manufacturing, it is understood will not come under the above arrangement." ·

Minor variations in the plan have occurred since that letter. Bausch & Lomb patented a lens called "Nokrome." Soft-Lite was advised that when Soft-Lite glass was used in the Nokrome lens, Soft-Lite should have exclusive distribution. There were other patented lenses manufac-

tured by Bausch & Lomb. Sometimes these lenses were ground from pink tinted glass and sometimes from other colors. Since these patented lenses were distributed by Bausch & Lomb under a licensee system, interference arose. Soft-Lite and Bausch & Lomb made mutually satisfactory adjustments so that their respective retailers might have some of the advantages of dealing in the Bausch & Lomb patented lenses ground out of Soft-Lite glass.

Again, Soft-Lite was released from its obligation to take second quality lenses and Bausch & Lomb agreed to sell them only in foreign countries where Soft-Lite had no offices and at prices acceptable to both Soft-Lite and Bausch & Lomb.

Reference has been made to the fact that Bausch & Lomb owned stock in optical wholesale companies which distributed Soft-Lite lenses and blanks. A stipulation stated that

"Bausch & Lomb, through its ownership of a majority of the outstanding voting stock of each of said wholesale companies, has power to coordinate and control the sales and pricing policies of said wholesale companies."

These subsidiaries were acquired by Bausch & Lomb "at intervals subsequent to the original arrangement with Soft-Lite." They now are the largest outlet for Soft-Lite lenses, taking sixty per cent of Soft-Lite sales. They were substantial customers of Soft-Lite before they became affiliates of Bausch & Lomb. Soft-Lite is treated by its wholesale customers alike whether or not the customers are Bausch & Lomb affiliates. It is equally true that all wholesalers have cooperated with Soft-Lite in the development of its system.

Bausch & Lomb thus profited from the Soft-Lite business in two ways: first, by profit made in manufacturing and selling to Soft-Lite; second, by sharing, through stock

ownership of wholesale distributors of Soft-Lite's goods, in the profits which lay between the Soft-Lite selling price and the consumer purchase price. Bausch & Lomb, the evidence shows, understood well as early as 1925 the advantages to itself through these subsidiaries of the Soft-Lite plan, which secured an increased profit for division among distributing agencies. As a consequence, Bausch & Lomb concerned itself with prices charged to wholesalers by Soft-Lite, discussed each step of the price mark-up from Soft-Lite up to the consumer, insisted that reductions in its prices to Soft-Lite should be passed along the distribution line, and through its affiliated corporations cooperated in the price arrangements and the elimination of undesirable retailers.

Soft-Lite's control of distribution did not cease with this sale of its goods to optical wholesalers. It sought as wholesale outlets distributors who were free from business alliances with Soft-Lite's competitors. It sold only to wholesalers who were willing to cooperate with its policy. These wholesalers it designated as dealers and sold its goods only through them. Soft-Lite's wholesalers were allowed to resell only to retailers who held licenses from Soft-Lite. When retailers were licensed, the wholesalers were notified that they were at liberty to sell to the specified retailer. On the cancellation of the license, the wholesalers were notified in writing that the retailer was no longer entitled to receive Soft-Lite lenses. If a wholesaler did business with unapproved retailers, it was excluded from Soft-Lite's list of designated wholesalers. The wholesalers were required to distribute with each pair of Soft-Lite lenses a numbered certificate called a "Protection Certificate." By this certificate the wholesale outlet for Soft-Lite lenses found in the hands of unlicensed retailers could be traced by Soft-Lite. The wholesalers were told that the certificates were intended for

this purpose. Soft-Lite indicated to the wholesalers the prices to be received by them from retailers by means of published price lists. Through these price lists, made available to wholesalers and retailers alike, the retailers could determine the prices wholesalers were to charge.

It was determined by the District Court (and this finding is without challenge) that Soft-Lite and the wholesalers understood that material deviation would result in the discontinuance of the offending wholesaler as an outlet.

Soft-Lite's plan of distribution was rounded out by its arrangements with the retail optical concerns. As we have just pointed out, the retailers knew from the published lists the prices the wholesalers were expected to charge them. The retailers were selected by Soft-Lite with care equal to that used in selecting wholesalers. Soft-Lite, in the words of its brief, was "manufactured and advertised as a quality product, Soft-Lite must be sold as such." "Ethical" retailer opticians and optometrists were sought. Those who quoted prices in their advertisements or operated as adjuncts to department or jewelry stores were frowned upon. Retail prices to consumers were not fixed by Soft-Lite. It seems to be admitted, however, that the retailer was required to maintain prevailing local price schedules. An application form dated February 1, 1939, for retail stock licensees calls for representations to that effect from the Soft-Lite representative recommending the application and the approval of a Soft-Lite wholesaler. This practice apparently applied to all retailers. The District Court found that retailers agreed to sell the lenses at prices prevailing in the locality and that Soft-Lite required retailers to sell the pink tinted lenses "at a premium over comparable untinted lenses."

Under its present system, Soft-Lite grants a revocable, exclusive and nontransferable "license" to the retailer to

buy Soft-Lite lenses and lens blanks from "licensed" Soft-Lite distributors or wholesale "licensees" and to resell the lenses at prevailing prices in the locality where the retailer is located. In turn, the licensee agrees to promote the sale of Soft-Lite lenses and to do nothing to injure their prestige. The licensee was required to state that he understood that the substitution of other lenses for Soft-Lite would adversely affect that prestige. The licensee further agreed to sell only under the trade names and mark of Soft-Lite and only to the consumer or patient.[2]

The retailer's agreement to conform to the license requirements was enforced by surveillance through Soft-Lite's salesmen and by cancellation of the retailer's license if he failed to abide by its terms. Wholesalers were notified of such cancellation.

The Miller-Tydings Act of August 17, 1937, 50 Stat. 693, amended the Sherman Act so as to permit minimum prices for the resale of a commodity which bears the trade mark of the distributor in states where contracts of that description are legal by statute so far as intrastate transactions are concerned, and beginning in 1940 Soft-Lite has entered into resale price maintenance contracts with a number of wholesalers, presumably in conformity with the Miller-Tydings Act. The District Court was of the view that these contracts "came into existence as a patch upon an illegal system of distribution of which they have become an integral part."

It is accepted by all parties that the transactions of Bausch & Lomb and Soft-Lite are in interstate commerce as the term "commerce" is used in the Sherman Act.

---

[2] In 1939 a change was made from the license agreement not to deal in any lens similar in tint, color or shade to Soft-Lite lenses. The change followed an agreed order of the Federal Trade Commission of June 23, 1938, Docket No. 2717, In the Matter of Soft-Lite Lens Co., Inc.

The judgment of the District Court determined that Soft-Lite and certain of its officers had contracted and conspired with optical wholesalers and retailers to violate the Sherman Anti-trust Act in the following particulars:

"(a) by entering into so-called 'license' agreements with optical retailers which fix the prices at which said retailers shall sell Soft-Lite lenses; (b) by entering into so-called 'license' agreements with optical retailers which provide that said retailers will sell such lenses only to the public; (c) by entering into agreements with wholesale customers which provide that the said wholesalers will sell Soft-Lite lenses and blanks only to retailers who are designated as 'licensees' by the defendant Soft-Lite Lens Company, Inc.; (d) by entering into agreements with wholesale customers which fix the prices at which said wholesalers shall sell Soft-Lite lenses and blanks; (e) by entering into 'Fair Trade' resale price maintenance contracts with said wholesalers as an integral part of the illegal distribution system of Soft-Lite blanks and lenses; and (f) by enforcing the agreements set forth in subdivisions (a) through (e) of this paragraph."

The judgment directs Soft-Lite to cancel its license agreements with retailers and its Fair Trade resale price maintenance contracts and agreements with wholesalers fixing prices and restricting their resales to Soft-Lite's retail licensees. Soft-Lite and its agents are enjoined from enforcing these contracts or using identification devices, such as the "Protection Certificates," for tracing resales of lenses or blanks purchased from Soft-Lite. They are likewise forbidden to enter into any other agreement similar in effect or purpose to those adjudged unlawful, except the Fair Trade contracts. These latter may be renegotiated after six months from the notices of cancellation which the judgment directs to issue. There is also a prohibition against Soft-Lite's and its officers' system-

atically suggesting resale prices on lens or blanks for said six months. Bausch & Lomb and various individuals are adjudged to be free of the violations which are charged in the complaint. The right to inspect records and to interview officers and employees is reserved to the Department of Justice in the manner set out below.[3] Finally, jurisdiction of the case is retained for further orders, or directions, including modification or termination of any of the provisions as well as their enforcement. Cf. *Sugar Institute* v. *United States*, 297 U. S. 553, 605.

Two appeals are before us. The Government seeks to establish that the agreement of Bausch & Lomb not to sell pink tinted glass or lenses to any competitor of Soft-Lite and not to compete with Soft-Lite in the marketing of any

---

[3] "9. That for the purpose of securing compliance with this Judgment, authorized representatives of the Department of Justice, upon the written request of the Attorney General or an Assistant Attorney General, shall be permitted access, within the office hours of the said defendants, and upon reasonable notice, to books, ledgers, accounts, correspondence, memoranda, and other records and documents in the possession or the control of the said defendants, or any of them, relating to any of the matters contained in this judgment, such access to be subject to any legally recognized privilege. Any authorized representative of the Department of Justice, subject to the reasonable convenience of the said defendants, shall be permitted to interview officers or employees of said defendants without interference, restraint or limitation by said defendants; provided, however, that any such officer or employee may have counsel present at such interview. Said defendants, upon the written request of the Attorney General, or an Assistant Attorney General, shall submit such reports with respect to any of the matters contained in this Judgment as from time to time may be necessary for the purpose of enforcement of this Judgment; provided, however, that the information obtained by the means permitted in this paragraph shall not be divulged by any representative of the Department of Justice to any person other than a duly authorized representative of the Department of Justice except in the course of legal proceedings in which the United States is a party or as otherwise required by law."

pink tinted lens unreasonably restrains commerce in violation of the Sherman Act. By its appeal, the Government urges also a broadening of the decree by the substitution of a permanent instead of a six months' injunction against new Fair Trade agreements and against systematic suggestion of resale prices by Soft-Lite. It also asks an addition to the decree requiring Soft-Lite to sell its product without discrimination to any person offering to pay cash therefor.

The other appeal is by Soft-Lite and those of its officers who are enjoined. This appeal attacks the provisions of the judgment cancelling agreements of Soft-Lite with wholesalers to charge uniform prices to retailers, enjoining systematic suggestions of resale prices and execution of Fair Trade resale price maintenance contracts even for six months, and allowing future discovery by the Department of Justice in order to police the decree.

Since the alleged illegality of the Soft-Lite distribution system is the heart of the scheme which the Government attacks, we shall examine first the judgment from the standpoint of Soft-Lite's objections to it and then from that of the Government's desired additions as to Soft-Lite.

As the Court is equally divided upon the issue raised in the Government's appeal in No. 62 by its request for a reversal of the provision of the judgment which dismisses Bausch & Lomb and its officers from the proceeding, that provision stands affirmed.

## I.

Our task of examining Soft-Lite's objections is simplified by the frank recognition of those appellants that "the retail license provisions binding dealers to sell at locally prevailing prices and only to the public constitute illegal restraints." Our former decisions compel this conclu-

sion.    Price fixing, reasonable or unreasonable, is "unlawful *per se.*"   *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150, 218; *United States* v. *Trenton Potteries,* 273 U. S. 392, 397; *Ethyl Gasoline Corp.* v. *United States,* 309 U. S. 436, 458; *Fashion Guild* v. *Trade Comm'n,* 312 U. S. 457, 465.    The retailer's price to his customer is the single source of stable profits for all handlers.

These illegal contracts cannot be considered, however, as happenings, completely insulated from other incidents of the Soft-Lite distribution system.    When we turn to the provisions of the decree which are attacked here by Soft-Lite, requiring it to cancel its resale price agreements with wholesalers as well as retailers and to avoid such requirements for six months either by contract or suggestion, and thereafter to act only in accordance with the Miller-Tydings Act, we must first note that it is plain that the arrangements for price maintenance in the wholesalers' sales to retailers are an integral part of the whole distribution system.    Not only are Soft-Lite wholesalers carefully selected and cooperative but they may sell only to Soft-Lite's retail licensees.    Undesirable wholesalers are excluded from the system and the District Court found that by means of published wholesale price lists, put in the hands of wholesalers and retailers alike, resale prices of wholesalers are designated by Soft-Lite.    The requirement of the wholesalers' recommendation as to the business character of the applicant for a retail license, the evidence of espionage, the limitation of resales to Soft-Lite retail licensees, the existence of the "Protection Certificate" to mark the wholesaler who might violate the arrangement, the uniformity of the prices, as prescribed in Soft-Lite's published lists, which are charged retailers by wholesalers—all amply support, indeed require, the inference of the trial court that a conspiracy to maintain prices down the distribution system existed between the wholesalers and Soft-Lite through the years prior to this suit.

Soft-Lite is the distributor of an unpatented article. It sells to its wholesalers at prices satisfactory to itself. Beyond that point it may not project its power over the prices of its wholesale customers by agreement. A distributor of a trade-marked article may not lawfully limit by agreement, express or implied, the price at which or the persons to whom its purchaser may resell, except as the seller moves along the route which is marked by the Miller-Tydings Act. *Dr. Miles Medical Co.* v. *Park & Sons Co.,* 220 U. S. 373, 404. Even the additional protection of a copyright, *Bobbs-Merrill Co.* v. *Straus,* 210 U. S. 339; *Interstate Circuit* v. *United States,* 306 U. S. 208, 221, and cases cited, or of a patent, *United States* v. *Masonite Corp.,* 316 U. S. 265, 276; *Mercoid Corp.* v. *Mid-Continent Investment Co.,* 320 U. S. 661, 664–665, and cases cited, adds nothing to a distributor's power to control prices of resale by a purchaser. The same thing is true as to restriction of customers. *Fashion Guild* v. *Trade Comm'n,* 312 U. S. 457, 465; *Standard Sanitary Mfg. Co.* v. *United States,* 226 U. S. 20, 47–49; *Montague & Co.* v. *Lowry,* 193 U. S. 38, 45.

Not only do the appellants urge that conspiracy between Soft-Lite and the wholesalers should not be found from the foregoing evidence but they also say that they come within the scope of certain of our cases which are said to indicate that a simple refusal to sell to customers who will not resell at prices fixed by the seller is permissible under the Sherman Act. They cite *United States* v. *Colgate & Co.,* 250 U. S. 300; *Federal Trade Commission* v. *Beech-Nut Packing Co.,* 257 U. S. 441, 452–3; *Federal Trade Commission* v. *Sinclair Refining Co.,* 261 U. S. 463, 475–6; and *Federal Trade Commission* v. *Curtis Publishing Co.,* 260 U. S. 568, 582. None of these cases involve, as the present case does, an agreement between the seller and purchaser to maintain resale prices.

The *Colgate* case turned upon the sufficiency on demurrer of an indictment under the Sherman Act against a manufacturer for requiring its dealers to maintain prices. As the indictment was construed to allege only specification of resale prices by the manufacturer and refusal to deal with customers who did not maintain them, this Court held the indictment insufficient as no reference was made in it to a purpose to monopolize and in such a posture the Sherman Act "does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal. And, of course, he may announce in advance the circumstances under which he will refuse to sell." 250 U. S. at 302, 306, 307. Cf. *United States* v. *Schrader's Son,* 252 U. S. 85, 99.

The *Beech-Nut* case recognizes that a simple refusal to sell to others who do not maintain the first seller's fixed resale prices [4] is lawful but adds as to the Sherman Act, "He [the seller] may not, consistently with the act, go beyond the exercise of this right, and by contracts or combinations, express or implied, unduly hinder or obstruct the free and natural flow of commerce in the channels of interstate trade." 257 U. S. at 453. The Beech-Nut Company, without agreements, was found to suppress the freedom of competition by coercion of its customers through special agents of the company, by reports of competitors about customers who violated resale prices, and by boycotts of price cutters. *Idem,* pp. 451, 454, 455. As the decision as to the Curtis Company involved only selling agencies, 260 U. S. at 581, and that as to Sinclair the restricted use of a distributor's gasoline tanks, 261 U. S. at 474, they are inapplicable to a consideration of a refusal by a distributor to sell except to chosen dealers.

---

[4] Cf. Robinson-Patman Act, § 1, 49 Stat. 1526.

As in the *Beech-Nut* case, there is more here than mere acquiescence of wholesalers in Soft-Lite's published resale price list. The wholesalers accepted Soft-Lite's proffer of a plan of distribution by cooperating in prices, limitation of sales to and approval of retail licensees. That is sufficient. *Interstate Circuit* v. *United States*, 306 U. S. 208, 226, 227; *United States* v. *Masonite Corp.*, 316 U. S. 265, 274–75; *Sugar Institute* v. *United States*, 297 U. S. 553, 601.

So far as the wholesalers are concerned, Soft-Lite and its officers conspired and combined among themselves and with at least some of the wholesalers to restrain commerce by designating selected wholesalers as sub-distributors of Soft-Lite products, by fixing resale prices and by limiting the customers of the wholesalers to those recommended by the wholesalers and approved by Soft-Lite—all in violation of the Sherman Act. This finding justifies the order directing cancellation of the wholesale arrangements and cessation by Soft-Lite of systematic price suggestions. Whether this conspiracy and combination was achieved by agreement or by acquiescence of the wholesalers coupled with assistance in effectuating its purpose is immaterial.

Soft-Lite makes objection also to the clause of the decree which holds null and void certain resale price maintenance contracts entered into by Soft-Lite and many of its wholesalers after the passage of the Miller-Tydings Amendment to the Sherman Act on August 17, 1937, 50 Stat. 693. See note 1, *supra*. Objections on the same grounds apply to other clauses of the decree forbidding enforcement of these existing "Fair Trade" contracts with wholesalers and Soft-Lite's entering into any others until six months after certain notices of cancellation which are required by the decree but which have not yet been given owing to this appeal. Soft-Lite contends that the "Fair Trade" agreements are strictly within the terms of the Miller-Tydings

Act and we assume the correctness of that position.[5] The disadvantage at which these clauses place Soft-Lite towards its customers and competitors is pointed out.

The District Court said that these contracts "came into existence as a patch upon an illegal system of distribution" and as an integral part of that system. As some wholesalers do certain cutting and edging work on the blanks for sale to retailers who do not do this grinding for themselves, the "Fair Trade" contracts for fixing resale prices apply only to those sales, known as "stock" sales, where the lenses and blanks are resold in the same form in which they come from Soft-Lite. See *United States* v. *Univis Lens Co.,* 316 U. S. 241, 253–54. We think that where a distribution system exists, prior to the making of such price maintenance contracts, which is illegal because of unallowable price fixing contracts and where that illegality necessarily persists in part because a portion of the resales are not covered by the "Fair Trade" contracts, as just explained, subsequent price maintenance contracts, otherwise valid, should be cancelled, along with the invalid arrangements, in order that the ground may be cleansed effectually from the vice of the former illegality. Equity has power to eradicate the evils of a condemned scheme by prohibition of the use of admittedly valid parts of an invalid whole. *United States* v. *Univis Lens Co.,* 316 U. S. 241, 254; *Ethyl Gasoline Corp.* v. *United States,* 309 U. S. 436, 461. Cf. *Standard Oil Co.* v. *United States,* 221 U. S. 1, 78; *United States* v. *Union Pacific R. Co.,* 226 U. S. 61, 96, 470, 476–77; *Aikens* v. *Wisconsin,* 195 U. S. 194, 205–6.

The last objection brought forward by Soft-Lite to the decree is that paragraph 9, which is set out in full in note

---

[5] See the decision below, 45 F. Supp. 387, 399. We do not understand the opinion of the District Court to impugn the validity of bilateral contracts, identical in form, between a producer or distributor, on the one hand, and their customers on the other, entered into under the Miller-Tydings Act.

3, is an unconstitutional exercise of judicial power by virtue of the provisions of the Fourth and Fifth Amendments or, at any rate, an improper use of the trial court's discretion.

The first sentence requires Soft-Lite to permit authorized representatives of the Department of Justice to have access to all records and documents of Soft-Lite which are in Soft-Lite's control, "relating to any of the matters contained in this judgment . . . subject to any legally recognized privilege." [6] The second sentence we construe to forbid Soft-Lite or its officers from directing its personnel to refuse to discuss with investigators of the Department the affairs of Soft-Lite relating to any of the matters contained in the judgment and from barring from their property investigators who may appear unprovided with search warrants. This second sentence purports to give no other right of investigation of the affairs of the appellants. The third and last sentence directs the defendants to submit on the written request of the Department such reports in writing "with respect to any of the matters contained in this judgment" as may be necessary to enforce it.

There is nothing in the United States Code relating to monopolies and combinations in restraint of trade which makes provision for such broad visitatorial powers. Without this statutory authority, United States officials could not require the corporation to submit to this examination without a search warrant. *Go-Bart Importing Co.* v. *United States,* 282 U. S. 344, 356–58; *United States* v. *Louisville & N. R. Co.,* 236 U. S. 318, 329–38. Cf. *Guthrie* v. *Harkness,* 199 U. S. 148, 158. The provision was evi-

---

[6] The wording of the sentence includes the papers of the individual defendants who are officers of Soft-Lite. The United States disclaims in its brief, page 55, so broad a meaning. We accept the suggested interpretation that the paragraph relates only to the papers belonging to the corporation. Cf. *Wilson* v. *United States,* 221 U. S. 361, 376–85.

dently sought and allowed to enable the Government to obtain information as to the operations of Soft-Lite subsequent to the judgment declaring Soft-Lite's distribution operations unlawful, to guide the responsible officials of the Department of Justice in their duty of protecting the public against a continuance of the illegal combination and conspiracy without the necessity of the expense and difficulty of extended investigation or renewed hearings under the jurisdiction retained for modification or enforcement. If reasonably necessary to wipe out the illegal distribution system, we see no constitutional objection to the employment by equity of this method. In the immediately preceding paragraphs of this opinion which discuss the power of the trial court to compel the cancellation of "Fair Trade" agreements, executed during and as a part of the unlawful distribution system, we cited important precedents of this Court which uphold equity's authority to use quite drastic measures to achieve freedom from the influence of the unlawful restraint of trade. These precedents are applicable here. The test is whether or not the required action reasonably tends to dissipate the restraints and prevent evasions. Doubts are to "be resolved in favor of the Government and against the conspirators." *Local 167* v. *United States,* 291 U. S. 293, 299; *Warner & Co.* v. *Lilly & Co.,* 265 U. S. 526, 532.

The Fifth Amendment does not protect a corporation against self-incrimination through compulsory production of its papers, *Wilson* v. *United States,* 221 U. S. 361, 375; *Hale* v. *Henkel,* 201 U. S. 43, 74–75; *Wheeler* v. *United States,* 226 U. S. 478, although it does protect an individual, *Boyd* v. *United States,* 116 U. S. 616. A corporation is chartered with special powers only. Its creator, the State, may examine into its records to see whether or not the privileges have been abused. Our dual form of government necessarily authorizes the United States to

exercise these powers in the vindication of its own laws. *Hale* v. *Henkel, supra.* The *Boyd* case pointed out that, as to individuals, the extortion of his private papers by subpoena was not only compelling self-incrimination but was also an unreasonable search and seizure within the Fourth Amendment. 116 U. S. at 634. Upon further examination of the problem of the inter-relation of the two Amendments in *Hale* v. *Henkel,* 201 U. S. at 72–73, this Court reached the conclusion that the Fourth Amendment was not intended to interfere with "the power of courts to compel, through a *subpoena duces tecum,* the production, upon a trial in court, of documentary evidence," so long as the scope of the subpoena was reasonable. The power of Congress to require disclosure of corporate documents, a question adverted to in *Hale* v. *Henkel,* p. 77, but not decided, was upheld in *United States* v. *Louisville & N. R. Co., supra.* The scope of equity's power, Sherman Act, § 4, 26 Stat. 209, to obviate continued restraint on trade in accordance with the Congressional direction as to the use of the injunction against violators of the Sherman Act is no more restricted in its field than that of Congress.

The appropriateness of the visitatorial remedy raises a different question. Of course, a mere prohibition of the precise scheme would be ineffectual to prevent restraints. *United States* v. *Trans-Missouri Freight Assn.,* 166 U. S. 290, 308. The circumstances of each case control the breadth of the order. *Labor Board* v. *Express Publishing Co.,* 312 U. S. 426, 436. The other provisions of the decree are important. If in the present case, Soft-Lite was required for the indefinite future to sell its goods to any buyer with cash to pay the purchase price, there would not be the same need for visitatorial powers. The first sentence of the provision of the decree under discussion compels the disclosure only of papers relating to the matters contained in the judgment. This we think is limited

sufficiently to satisfy the rule as to necessary certainty. *Wilson* v. *United States, supra.* We cannot say that the first two sentences of the 9th paragraph of the decree, as herein construed, were beyond the discretion of the trial judge. We are of the view that the third sentence, relating to reports, is too indefinite for judicial enforcement and therefore improper. Cf. *Swift & Co.* v. *United States,* 196 U. S. 375, 400, 402.

## II.

The United States seeks extensions of the decree as entered against Soft-Lite. In the Government's view the existing prohibitions, although coupled with the retention of jurisdiction for further orders or directions, including modification and enforcement, are insufficient to prevent continuance of the purposes and effects of the unlawful Soft-Lite distribution system. Specifically, we are asked to direct the inclusion of requirements that Soft-Lite file "with the district court a written instrument providing that it will sell its product, without discrimination, to any person offering to pay cash therefor."

The Sherman Act is intended to prevent unreasonable restraints of commerce. The Clayton amendment, 38 Stat. 731, outlawed agreements with customers which restricted the customer from dealing with the products of a competitor of the seller. Persons injured by unlawful restraints may recover threefold damages. The federal courts have jurisdiction of suits to enjoin violations. Congress has been liberal in enacting remedies to enforce the anti-monopoly statutes. But in no instance has it indicated an intention to interfere with ordinary commercial practices. In a business, such as Soft-Lite, which deals in a specialty of a luxury or near-luxury character, the right to select its customers may well be the most essential factor in the maintenance of the highest standards of

service. We are, as the District Court apparently was, loath to deny to Soft-Lite this privilege of selection. *United States* v. *Colgate & Co.*, 250 U. S. 300, 307; *Federal Trade Comm'n* v. *Raymond Co.*, 263 U. S. 565, 573. We have no reason to doubt that Soft-Lite will conform meticulously to the requirements of the decree. When it is shown to the trial court that it has not done so will be an appropriate time for the Government to urge this addition to the decree.

What we have just said as to the Government's request for a requirement of sales by Soft-Lite to all applicants for its commodities is relevant to the Government's other request for modification of the decree to make permanent the six months' prohibition against Soft-Lite's systematically suggesting resale prices on its lenses and the execution of resale price maintenance contracts under the Miller-Tydings Act. The path is narrow between the permissible selection of customers under the decision in *Colgate & Co.* and unlawful arrangements as to prices under this decree, but we think Soft-Lite is entitled to traverse it, after a reasonable interim to dissipate unlawful advantages, with such aid as Congress has given by the Miller-Tydings Act. The suggestion for a permanent injunction is unacceptable.

These conclusions lead us to modify the judgment by striking out the last sentence of paragraph 9, quoted in note 3. As so modified the judgment is affirmed.

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.