**HATHAWAY MOTORS, Inc., et al.,**
**v.**
**GENERAL MOTORS CORPORA-**
**TION et al.**
**Civ. A. No. 5072.**

United States District Court
D. Connecticut.
March 1, 1955.

Sydney Alderman, New Haven, Conn., Malkan & Ellner, New York City, for plaintiffs.

Frederick H. Wiggin, Wiggin & Dana, New Haven, Conn., Henry M. Hogan, Gen. Counsel, Gen. Motors Corp., Detroit, Mich., for defendants.

SMITH, Chief Judge.

Plaintiffs, formerly independent, unfranchised automobile dealers, are suing for treble damages under the anti-trust laws. They have joined as defendants General Motors Corporation, Ford Motor Company, and the Chrysler group as manufacturers, certain "authorized" or franchised dealers, and various others including the General Motors Acceptance Corporation, Chrysler Sales Corporation, and the National Automobile Dealers Association.

Defendant General Motors Corporation has moved to dismiss the complaint for failure to state a claim upon which relief can be granted. In its attack GMC has segmented the complaint and endeavored to show the failings of each part—the "whole is no greater than the sum of its parts" approach. Summarizing, GMC says the following: it is not enough merely to complain of an alleged violation in the words of the statute but facts must be shown establishing misconduct, Black & Yates v. Mahogany Association, 3 Cir., 129 F.2d 227, 231, 148 A.L.R. 841,

and the plaintiffs allege no facts showing a restraint on commerce by GMC; the necessary allegations of facts establishing a violation through conspiracy, contract, or agreement are missing and "conscious parallelism" alone does not constitute a violation, Theatre Enterprises v. Paramount Film Distributing Corp., 346 U.S. 537, 541, 74 S.Ct. 257, 98 L.Ed. 273; there is no real allegation of public injury and there hardly could be such because competition has been steadily increasing over the years to its high peak of the present day; that the defendants did not choose to do business with the plaintiffs is a local matter not under the anti-trust provisions, United States v. Bausch and Lomb, 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024; Brosious v. Pepsi-Cola Co., 3 Cir., 155 F.2d 99; and it was the plaintiffs' purchases of cars with defective titles in their "bootleg" operations which was the proximate cause of their injury, not the defendants' failure to deal with them.

GMC would have this court find that the complaint fails to meet the requirements set forth in Feddersen Motors v. Ward, 10 Cir., 1950, 180 F.2d 519, 522:

"And in a case of this kind brought by an individual suitor for the recovery of three-fold damages, it is essential that the complaint allege a violation of the Act in the form of undue restriction or obstruction of interstate commerce and damages to plaintiff proximately resulting from the acts and conduct which constitute the violation. But injury to plaintiff alone is not enough upon which to predicate such an action. There must be harm to the general public in the form of undue restriction of interstate commerce * * *. And a general allegation of the forming of such a combination or conspiracy with resulting injury to the public and to the plaintiff is not enough. While detail is not necessary, it is essential that the complaint allege facts from which it can be determined as a matter of law that by reason of intent, tendency, or the inherent nature of the contemplated acts, the conspiracy was reasonably calculated to prejudice the public interest by unduly restricting the free flow of interstate commerce."

The plaintiffs object to atomizing the complaint. They claim it should be read as a whole, and if so approached, they say it satisfies the purpose of pleadings as described in Hickman v. Taylor, 329 U.S. 495, 501, 67 S.Ct. 385, 388, 91 L. Ed. 451:

"The new rules, however, restrict the pleadings to * * * general notice-giving and invest the deposition-discovery process with a vital role in the preparation for trial."

Plaintiffs claim that they have alleged the aggregate effect of all the acts of the defendants and their conspiracy as embodied in the exclusive dealing distribution system, and that such is sufficient.

In dealing with a motion to dismiss for failure to state a claim, the rule of Dioguardi v. Durning, 2 Cir., 1944, 139 F.2d 774, should be kept in mind. Such dismissal should not be granted unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim.

Reminded of this, what do we find in the complaint? Plaintiffs allege the rigid maintenance of a system of exclusive dealer franchises, arbitrarily limited in number and location, which operates to exclude from the business of selling current model automobiles those independents who will not submit and conform to the system. Plaintiffs allege the system is maintained by a careful policing designed to restrain franchised dealers from selling to independents and is supported by various forms of pressure effectively exerted on banks, finance companies, newspapers, and even legis-

lative bodies. Plaintiffs say the system fosters, and is in fact guilty of, forced tie-in sales of accessories and services at excessive prices. They say the public is deprived of free competitive pricing by the control over retail prices exerted by the manufacturers in both the new and used car markets. And they allege their own injury, being forced out of business because of inability to compete with franchised dealers.

Taking the allegations as true, the situation may be characterized as one in which a would-be distributor is denied access to sources of supply because of exclusive dealing contracts. Standard Oil Co. v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371, involved the reverse circumstances. A big supplier had tied up many outlets with requirements contracts. The Supreme Court said, 337 U.S. at page 314, 69 S.Ct. at page 1062:

"It cannot be gainsaid that observance by a dealer of his requirements contract with Standard does effectively foreclose whatever opportunity there might be for competing suppliers to attract his patronage, and it is clear that the affected proportion of retail sales of petroleum products is substantial. * * * Standard's use of the contracts creates just such a potential clog on competition as it was the purpose of Section 3 to remove wherever, were it to become actual, it would impede a substantial amount of competitive activity."

The plaintiffs would seem to have alleged a system the operation of which causes a restriction on the free flow of goods in commerce and a "potential clog on competition".

One further item demands attention. The complaint lacks a clear-cut assertion of concerted activity by the defendants. The plaintiffs seem to rely on the inference of "conscious parallelism".

Theatre Enterprises v. Paramount, supra, involved a neighborhood motion picture exhibitor who was trying to break the system used by various distributors of "first-run" showings in downtown areas of Baltimore. The court said, 346 U.S. at pages 540–541, 74 S.Ct. at page 259:

"The crucial question is whether respondents' conduct toward petitioner stemmed from independent decision or from an agreement, tacit or express. To be sure, business behavior is admissible circumstantial evidence from which the fact finder may infer agreement. * * * circumstantial evidence of consciously parallel behavior may have made heavy inroads into the traditional judicial attitude toward conspiracy, but 'conscious parallelism' has not yet read conspiracy out of the Sherman Act entirely."

It is open to plaintiffs to prove conscious parallelism of business activity. Difficulties of convincing the trier to draw the inference of agreement from the proof of parallelism should not militate against the complaint at this time.

Defendant General Motors' motion to dismiss is denied.

*

# INTANGIBLES IN THE JUDICIAL PROCESS

### By

### HON. WILLIAM J. PALMER

Judge of the Superior Court of California
in and for the County of Los Angeles

---

We have in the world today a self-styled intellectual who classifies himself as a Dialectical Man. He calls his credo "Dialectical Materialism." The achievements of this man in our modern era have bordered on the astounding. In espionage, deception, corruption of public officials, and manipulations for the overthrow of governments, his work never has been equalled. He has gained vast temporal power and control of incalculable potentials for violence, oppression and brutality. All of us should know something of his philosophy.

That philosophy is really quite simple, in spite of all his wordy efforts to make it appear profound and abstruse. The word "dialectical," as he uses it, is largely window dressing. It is a Greek word, or rather an anglicized Greek word, and it denotes the concept of logical argumentation. What the so-called Dialectical Man wants you to think is that his philosophy is one of reason and science, not of emotion or faith or inspiration or revelation.

The progenitors of "dialectical materialism" and its twin brain-child, communism, were Karl Marx, who died in 1883, and Frederick Engels, who died in 1895. In their use of the word "dialectical" they followed a pattern of word perversion which communists have followed rather consistently ever since. Before Marx and Engels came upon the scene, one of the world's great philosophers, Hegel, who lived from 1770 to 1831, had made a profound impact upon the thinking of thinking people. In his writings he had used the word "dialectic" rather conspicuously, and by that use the word had acquired a specific meaning and a certain prestige.

Hegel was an idealist, albeit a practical one, with his feet pretty well on the ground for a philosopher. He believed and taught that the primary and ultimate reality in our universe is spirit.

In his reasoning, God is the most certain thing in the world; man is pure spirit; and Christianity is the absolute religion.

Hegel pointed out that the normal thinking person goes through a process of development somewhat like this: Yesterday he had a theory or a thesis about life or some phase of it, which he believed summed up the whole truth. But today brings a new experience or a new bit of knowledge that disturbs that theory or qualifies it. As a consequence, the thinking mind works out a reconciliation or a synthesis between yesterday's theory and today's experience. The result is a new theory with which the mind enters the tomorrow. And tomorrow and the next day and through the years, this process of development continues. Hegel called the process dialectic. It is, in other words, a debating of a man with himself, a continuing forensic contest between theory and experience, as a person strives for and approaches the truth.

In capitalizing on what Hegel had done for a word, Marx and Engels prostituted the borrowed capital to a creed wholly in conflict with Hegel's philosophy. And that is the creed called "Dialectical Materialism". It is the religion of the so-called Dialectical Man. His professed beliefs may be summed up as follows:

He postulates that the primary, ultimate and only real reality is matter—hard, solid matter such as we used to think constituted the atom. That reality is not the creation of any intelligent being, and no such being exists behind or beyond it. By a thousand, perhaps a million, purely accidental events, accidentally related in an amazing sequence, primordial matter has lifted itself up by its own boot straps and has evolved into the human brain, its highest point of development. Hence man, the owner of that brain, is, himself, the supreme being. As such he is not subject to any moral, natural or divine laws. But being only a parcel of matter in a world of material things, man is not able to think through, beyond or above his environment. To the contrary, his environment thinks for and through him. Hence the only way to change his thinking is to change the physical conditions of his life. And the only kind of environment that will induce the right sort of thinking within his brain is one in which neither private property nor political government exists, and in which all the material affairs of the earth are embraced within a vast economic structure, theoretically owned and managed by the proletariat, a classless society.

It is not my purpose here to make a broad, frontal attack against this philosophy. If one were to do so, he could command an array of facts, experiences, logical principles, thoughts and per-

sonalities so inspiring and so thrilling as to fill the mind with wonder and the heart with rejoicing and with pride in being a man. He could call first upon science itself and upon many of the greatest scientists. Expressing itself through the Einstein formula that Energy equals Mass times the square of the speed of Light, science has demonstrated that the "hard, solid matter" of the materialists is only a concentration or fixation of energy; and no scientist on earth knows what energy is unless it is, speaking simply and frankly, the will of God.

A logician would force the Dialectical Man through the twistings of his own self-contradictions and would show that the man himself refutes what he professes to believe. The effects of his creed upon human personality would condemn it. Nearly all the greatest men and women of history, those who have given us our culture and our enlightenment, would testify against it. And numerous persons, some renowned, but more from the common walks of life, could tell of personal experiences that give evidence of the reality of the spirit.

For the present, let us concentrate on just one aspect of our civilization, the judicial process. It is not necessary here to expound how vital that process is if we are to have any security of person or property, if we are to have domestic peace, an intelligent and just measure of freedom, and a healthy, encouraging prevalence of integrity and fair play in our dealings with one another.

In that kind of judicial process which is one of the ideals and one of the goals of a republic, the essential factors which we employ and with which we deal are intangible and spiritual. They cannot be purchased in the market place; they never have been captured in the test tube of the laboratory, nor seen under the most powerful microscope; they cannot be weighed or measured by any physical instrument; and they never have been found in the human body by the most skilled pathologist.

In this judicial process we deal with three problems: the problem of discovery, the problem of law, and the problem of justice, which sometimes is sublimated and may be complicated by the problem of mercy.[1]

In the effort of discovery, we use, broadly speaking, three devices of proof. One is demonstration. For example, the contract

---

[1] This reference to mercy contemplates the field of criminology. In civil litigation, each party is entitled to justice. In consequence, unless one of the parties voluntarily does mercy, or the trier bestows it at his own expense, to permit mercy to interfere with justice is to deny justice to one of the parties.

involved in a case can be produced in court. So can a piece of machinery. A building can be inspected. This is demonstration. Another device of proof is the reasonable inference which the trier may draw voluntarily or be directed to draw by the law. And the third device, being the one from which most proof is derived, is the oral testimony of witnesses.

Hence it is that in our effort to discover the truth, we are very largely dependent upon the integrity of the witness. Other factors, of course, are involved: The intelligence of the witness, his point of view, his powers of observation, his memory, his interest in the case, and his faculty of expression.

Bennett Cerf has told this story:

When Sir Walter Raleigh was imprisoned in the Tower of London, he undertook to while away the hours by writing a history of the world. He had done about 200 pages of foolscap when, one morning, two prisoners in the courtyard became involved in an altercation. It led to fisticuffs, and the inmates, from their barred windows, yelled and cheered the battlers on until they were torn apart by the guards. At mess that noon everyone was talking about the fight—just as we do today in America. Sir Walter listened attentively to the stories of eight prisoners about the fracas. But no two stories were alike. When he returned to his prison room, he picked up his manuscript of history, tore it into bits and threw the pieces away, thus ending his venture in telling the world's past.[2] Apparently his confidence in the sources of history had been badly shaken by the eye-witness accounts of the day's most exciting event.

Today we know that his experience with the varying faculties of observation and memory was not extraordinary. It has been verified many times in the psychology classrooms of our colleges.

But if from all the factors that affect the dependability of oral testimony, there were to be subtracted the integrity of intent which more often than not exists, the problem of discovery would become infinitely more difficult, and often impossible of solution.

It seems meet to add that the integrity of the judge or juror is quite as important as that of the witness. A law of psychology makes this so. That law has been expressed in different ways. James Russell Lowell put it this way: "The kind of world one carries about within himself is the important thing, and the world outside takes all its grace, color, and value from that."

2 "Try and Stop me", pp. 253, 254.

Another person was thinking of the same law when he said: "The worst penalty a man suffers from being dishonest is not that others do not trust him, but that he does not trust others."

The most honest judge or juror, of course, may err, but the trier of fact who is not himself the soul of integrity cannot be better than a capricious judge of the credibility of witnesses.

The second problem of litigation, the problem of the law, can be even more challenging to the intellect and spirit of the jurist than the discovery of facts.

The layman often has expressed puzzlement over the fact that even we who have been educated in the law and have had long experience in it, still have difficulty at times knowing what the law is. To explain that situation thoroughly would require more words and time than the purpose and restrictions of this essay allow.

Two causes, however, can be mentioned briefly: One is that man has developed an almost limitless capacity for contriving and enacting laws, while his ability to understand them, the need for and the practical effect of them, has remained conspicuously limited. Secondly, man, in the exercise of his free will, always has had an infinite capacity for getting into trouble, new kinds of trouble, stranger than fiction, which the wisest lawmakers do not and cannot anticipate.

A few years ago, Benjamin Fairless, then President of the United States Steel Corporation, estimated that since Moses gave us the Ten Commandments, 30,000,000 laws had been enacted by earth dwellers to regulate the conduct of their fellow men. He expressed some doubt whether, in all those laws, any improvement had been made on the Decalog.

Law, in its ideal and truest sense, is the articulated effort of the members of a society to get along together; and regardless of how rarefied the atmosphere of idealism in which a specific law may be conceived, it must come down to earth and walk with men in their everyday affairs before we can know its real meaning or its workability.

Another Bennett Cerf story is apt:

King Henry IV, who ruled England from 1399 to 1413, was in some respects a puritan. The wearing of jewels and golden ornaments by his subjects offended his sense of propriety. So he issued a decree prohibiting such personal adornment. Nobody, however, obeyed the law. It was totally ignored. It was, you see, a law which, instead of helping people of various types, tastes

and ideas get along together, attempted an arbitrary imposition upon all of one person's idea in a matter of personal taste.

But Henry IV was not wholly lacking in either cleverness or persistence. He amended his law by providing that prostitutes and pickpockets were exempt from its operation. The next day not a jewel or golden ornament was to be seen in all the streets of London.

This success, however, was short-lived. The king had a French wife who probably was no puritan. In flagrant defiance of the King's decree, she appeared one day in court decorated like a show window at Tiffany's. The king did not order her prosecuted; instead he repealed the law.[3]

One of the most penetrating observations ever made about law was made by Harlan F. Stone, Chief Justice of the United States Supreme Court from 1941 to 1946, and an Associate Justice for 16 prior years. Justice Stone once said:

> "The law itself is on trial in every case, as well as the cause before it."

To that statement, I would add that from that trial of the law, only the spiritual attributes of men, tested and proved in practical experience, and including that priceless faculty which we call "good horse sense," can bring forth the right answer.

Another fact which the layman sometimes has difficulty comprehending is that even in a democracy, law and justice do not always coincide. Hence it is that even after the problems of discovery and of law have been solved, a third problem may confront us, that of justice. Sometimes this problem can be solved; sometimes it cannot be. If a law generally and in most instances contributes to justice, no farsighted jurist will defy or distort it in an effort to achieve justice in a specific case.

The headwaters of the main stream of our jurisprudence are to be found in the history of the Roman Empire and in Rome's magnificent contribution to the art and science of law and judicial administration. One of her greatest legal scholars was a counsellor named Ulpian, who lived over 1700 years ago. He was the author of 23 profound treatises on the law, and he coined many of the pithy statements of legal principles, or maxims, which still are stored in our legal dictionaries, and which we judges use occasionally when we wish to appear learned.

---

[3] "Try and Stop Me", p. 253.

We have no better definition of justice than that given us by Ulpian. "Justice", he said, "is the constant and perpetual will to allot to every man his due."

If we will supplement that definition by the insight of a poet and the wit of the Irish, we shall realize, I believe, how intangible and spiritual the concept of justice is, and yet how real and practical the dealing out of justice or injustice can be. The poet to whom I refer was also an astronomer of medieval Persia. His name and some of his lines are familiar to those of you who have read the Rubaiyat of Omar Khayyam. It was he, for example, who sang:

"Some for the Glories of This World; and some
    Sigh for the Prophet's Paradise to come;
Ah, take the Cash, and let the Credit go,
    Nor heed the rumble of a distant Drum!"

Well, Omar saw and said that "justice is the *soul* of the universe."

And the dash of Irish wit to which I refer appeared in a recent issue of the Irish Digest. It was to this effect: "People who forever complain that they do not receive what they deserve ought to congratulate themselves." Like most quips, that one is not altogether true. But such truth as abides in it, if reflected upon, will make us all realize how fortunate we are that such a thing as mercy flows from the heart of God and has found a place in the hearts of men.

It is unfortunate, however, that so noble a sentiment as mercy is sometimes misinterpreted, sometimes unappreciated, taken advantage of, or even exploited. The consequence is that the questions of when and how to season justice with mercy often require the utmost in thoughtful and far-seeing judgment.[4]

We would rob our literary heritage of a treasure if we were to take from it Shakespeare's eulogy of mercy, voiced through his character Portia, in her plea for the Merchant of Venice. You may remember it from your school days:

"The quality of mercy is not strained. It droppeth as the gentle rain from heaven upon the place beneath. It is twice blest. It blesseth him that gives and him that takes.   .   .   ."

And skipping to the end:

"But mercy is above the sceptred sway. It is enthroned in the *hearts* of kings. It is an attribute to God Himself".

4 See Note 1.

But let us not forget that if mercy comes from the *heart* of the universe, justice, the "constant and perpetual will to allot to every man his due", is, as Omar Khayyam said, the *soul* of the universe.

Now I have touched in a cursory way upon the three problems in litigation. A very important fact remains to be stated.

The cornerstone of our Anglo-American temple of jurisprudence is the principle that when a judge addresses himself to these problems, he must do so with absolute impartiality. This does not mean that his mind must be a blank in respect to any of the various moral, social, political and other matters on which thinking people hold opinions. It means that he must have no bias for or against any party to the case, and no relationship or mental condition that would incline him, without regard to the evidence and the law, to favor or to prejudice either party as against the other.

Bias puts colored glasses on the judge or juror, or glasses that distort the vision. Its effect is like taking the wrong way at the fork of a road. At the start, as far as the eye can see, no substantial difference may be in view; but as the roads wind on, they become farther and farther apart, and the prong of the fork that started with bias leads farther and farther away from the truth and justice.

In my library are two rare and beautifully bound volumes titled "The Lives of the Chief Justices of England". The work was authored by John Lord Campbell, who, in the middle of the 19th century, was for a time both the Chief Justice and the Lord High Chancellor of England. I have noted throughout this work that freedom from bias is considered as being quite as important and as necessary to judicial competence as freedom from corruption. The two, of course, may not be on the same level of turpitude, but they can lead to the same result.

In all this we find the striking contrast between the judicial process of spiritual men and that of "Dialectical Materialism." The Minister of Justice of communist East Germany, the highest judicial officer of the area, has proclaimed:

"There must not remain a single judge who is not a partisan of the revolutionary class struggle. If a judge tries to be impartial, he is himself guilty of a crime—the crime of objectivism—and deserves punishment." [5]

---

[5] "The World's Worst Woman" by Norbert Muhlen, The Saturday Evening Post, vol. 228, No. 1, July 2, 1955, pp. 25, 74.

Now, in brief review, I would mention again the vital intangibles of the judicial process as we know and want it in America: integrity, law, justice, mercy and impartiality. To them, I would add especially for the trial judge, courage, which he sometimes needs lest he betray his trust, and patience, which he often needs in infinite degree. These are all ideals—attributes and tools of another ideal, human personality. But they are as real and as functional as the chairs on which you sit.

They are the kind of ideals that Dr. Albert Schweitzer had in mind when he wrote:

> ". . . ideals that carry within themselves enduring worth will adjust themselves to changing circumstances and grow stronger and deeper in the midst of them. Such an ideal is that of human personality. Were it to be given up, the human spirit would be destroyed, which would mean the end of civilization, and even of humanity." [6]

[6] "Albert Schweitzer, An Anthology", edited by Charles R. Joy, p. 136.