**UNITED STATES of America,
Plaintiff,**

v.

**UNIROYAL, INC. (formerly known as
United States Rubber Company),
Defendant.**

**No. 64 Civ. 1949.**

United States District Court
S. D. New York.
May 5, 1969.

## OPINION

POLLACK, District Judge.

The complaint in this action was filed on June 24, 1964 under Section 4 of the Sherman Act to prevent and restrain defendant from alleged continuing violations of Section 1 of the Act, 15 U.S.C. § 1, in interstate trade and commerce in rubber-soled canvas footwear, produced and sold by defendant under the names of "Keds" and "Kedettes".* The first paragraph of the multi-paragraph prayer for relief contains the customary request that this Court "adjudge and decree" that the defendant violated the Sherman Act. The remaining paragraphs specify the various injunctive remedies sought against the defendant to restrain its future conduct.

The defendant filed its answer on July 15, 1964 denying all of the substantive

---

* In 1967, defendant changed the designation of its "Kedettes" footwear to its registered trademark "Grasshoppers", a name formerly used to designate a style of "Keds". In 1968, defendant broadened the "Grasshoppers" line to include leather sandals previously called "Royal Continentals" which are not included in this action. Throughout this opinion and the findings herein, the term "Kedettes", whether or not so expressly stated, shall include the footwear now called "Grasshoppers" as well, except for that portion of the line formerly called "Royal Continentals".

allegations of the complaint. On June 21, 1967, an order was filed amending the caption of the action to show defendant's change of name from United States Rubber Company to Uniroyal, Inc.

Both sides engaged in extensive discovery, by deposition and otherwise, which was completed shortly before the commencement of the trial. This included approximately 75 depositions, five sets of interrogatories, the exchange of a vast quantity of documents both by agreement of counsel and by formal process and requests to admit pursuant to Rule 36 of the Federal Rules of Civil Procedure. The parties stipulated to a number of matters and these are reflected in the findings of fact contained herein.

The Government claims that the defendant has combined and conspired to eliminate price competition among retail dealers and to curtail or eliminate the participation of discount retailers in the distribution of "Keds". As a result, the Government asserts, consumers were forced to pay high, arbitrary and noncompetitive prices for "Keds" and "Kedettes".

The Government sought to establish that the defendant made known to its retailers "suggested" or "anticipated" resale prices and secured their promise, in advance of sales, to resell "Keds" and "Kedettes" only at those prices. The Government further claimed that, on the basis of complaints made by competing retailers, the defendant sought to convince price-cutting retailers to maintain prices in the future and that in most cases such retailers agreed. It also claimed that in a number of instances the defendant refused to sell "Keds" and "Kedettes" to retailers who did not adhere to the suggested or anticipated prices and renewed such sales only after receiving an assurance of future adherence. Further, it was claimed that to prevent price-cutters from obtaining the canvas footwear from other sources, the defendant secured agreements from retailers that they would not resell to other retailers; and that, to assure the elimi-nation of retail price competition, the defendant obtained the agreement of price-cutting retailers to cease sales at particular locations.

Defendant denied the charge of conspiracy. It presented a defense consisting, in part, of its refutation and explanation of the circumstances of a substantial number of episodes of alleged unlawful activity. Defendant asserted that any unlawful practices on the part of its sales personnel were ancient, sporadic, isolated occurrences which had no anti-competitive effects at the time and have none now. Moreover, defendant contended that substantial direct and positive testimony and other evidence conclusively showed that these practices were unauthorized.

The evidence adduced at trial established the existence of thirty-eight episodes in which some of defendant's salesmen and occasionally, sales managers, took action intended to curb price-cutting. Although such episodes were too few in number to have had any significant impact on competition, they were nonetheless violative of the Sherman Act and should have been eradicated by a more alert and stern policing system than defendant had in effect at the time.

During the past six to eight years, there has been a substantial rise and spread of chain and discount operations and other price-cutting retailers. These have come to be accepted as a way of retail life. There has also been an increase in the number of lines of rubber-soled canvas footwear, including imported ones, competitive with "Keds" and "Kedettes". Concurrently with these developments, antitrust law has gradually reached a more restrictive definition of permissible conduct on the part of a manufacturer-supplier aimed at maintaining resale prices on its goods.

Defendant has abandoned the practices violative of the Sherman Act; it has instructed its sales staff that any attempt to maintain resale prices is unlawful; and it has changed personnel and assignments within its sales organization to

insure proper business conduct on their part.

■ Looking back, it is plain that all parts of the sales organization did not fall into legal step at once. But the evidence is clear and convincing that the activity of the kind complained of by the Government has ceased; and the defendant's intent, expressed on the record, to comply with the law in the future is accepted as bona fide. Accordingly, on the entire record presented to this Court, no substantial basis has been established by credible evidence that there is any danger of recurrent violation. Hence, there is no warrant for injunctive relief.

The considerations in detail that have led the Court to these findings and conclusions are as follows.

Defendant is a New Jersey corporation. It has its principal place of business at 1230 Avenue of the Americas, New York, New York in this district. It engages in interstate commerce by manufacturing, advertising and selling rubber-soled canvas footwear (often called "canvas footwear") and other products.

Defendant is the largest manufacturer and distributor of rubber-soled canvas footwear in the United States. It markets certain of its men's, women's and children's footwear under its registered trademarks, "Keds" and "Kedettes". Defendant advertises such footwear nationally and locally by way of television, radio and periodicals, and distributes most of its "Keds" and "Kedettes" to retailers throughout the United States for resale to consumers.

Defendant does its domestic manufacturing and selling through separate operating divisions. It formerly manufactured and sold "Keds" and "Kedettes" through its footwear and general products division. That division was dissolved on April 17, 1962 and from that date defendant has continued to manufacture and sell "Keds" and "Kedettes" through its consumer and industrial products division. Both divisions have had their main headquarters in New York City and ancillary headquarters in Naugatuck, Connecticut.

The wholesale price levels of the different styles of the "Keds" and "Kedettes" that are offered by the defendant differ substantially from one another. The cheaper lines of "Keds" have included at different times such styles as the "Rover", the "Duo-Life Bal", the "Olympia" and the "Gladiator".

Defendant from prior to 1958 to the present has communicated "suggested" or "anticipated" retail prices to many of its retailers throughout the United States through published lists or oral communications to such retailers by defendant's employees and agents.

Such prices have been distributed locally by defendant's district sales managers or salesmen and not on a nationwide basis by defendant's central offices. In some districts some salesmen have distributed such lists, and others have not. Some of the salesmen have given such lists only to those who have asked for them. The suggested retail prices given in the lists distributed by the district sales managers or salesmen have not necessarily coincided with those contained in the lists distributed by defendant's central offices.

■ The relevant legal rules are clear. A combination or conspiracy between a manufacturer-supplier and its retailer-customers which interferes with the setting of retail prices by free market forces is unlawful *per se*. Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911); Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968). A manufacturer-supplier may not lawfully restrict the disposition of the goods which it has sold to its retailer-customer. United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967).

The authorities have always distinguished between situations, on the one hand, in which a manufacturer-supplier simply announces its suggested retail prices and refuses to sell to distributors

and dealers which do not maintain the suggested price and those situations, on the other hand, in which the manufacturer-supplier takes further steps to effectuate compliance with its suggestion. In the former category, the manufacturer is merely exercising its lawful right to select its customers where other and equivalent brands are readily available on the market. United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L. Ed. 992 (1919), cited and explained in United States v. Arnold, Schwinn & Co., 388 U.S. at 376, 87 S.Ct. 1856; United States v. Parke, Davis & Co., 362 U.S. 29, 43, 80 S.Ct. 503, 4 L.Ed.2d 505 (1959); United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 722, 64 S.Ct. 805, 88 L. Ed. 1024 (1944); FTC v. Beech-Nut Packing Co., 257 U.S. 441, 452–453, 42 S.Ct. 150, 66 L.Ed. 307 (1922); Susser v. Carvel Corp., 332 F.2d 505 (2d Cir. 1964), cert. dismissed, 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965); Interphoto Corp. v. Minolta Corp., 295 F. Supp. 711 (S.D.N.Y.1969, Herlands, J).

Although a unilateral refusal to deal which does not eventuate in an agreement does not itself violate Section 1 of the Sherman Act, no matter what the reason, see Turner, The Definition of Agreement under the Sherman Act, Conscious Parallelism and Refusals to Deal, 75 Harv.L. Rev. 655, 690 (1962), any express resale price-fixing agreement is *per se* unlawful. Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968); Simpson v. Union Oil Co., 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964); United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024 (1944); United States v. Univis Lens Co., 316 U.S. 241, 62 S.Ct. 1088, 86 L.Ed. 1408 (1942); United States v. A. Schrader's Son, Inc., 252 U.S. 85, 40 S.Ct. 251, 64 L.Ed. 471 (1920); Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911). The combination or conspiracy required by Section 1, however, need not be express; concerted action may be inferred from a course of conduct by the alleged participants. Interstate Circuit, Inc., v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939); Girardi v. Gates Rubber Co. Sales Div. Inc., 325 F.2d 196 (9th Cir. 1963). Moreover,

an unlawful combination is not just such as arises from a price maintenance *agreement*, express or implied; such a combination is also organized if the producer secures adherence to his suggested prices by means which go beyond his mere declination to sell to a customer who will not observe his announced policy. United States v. Parke, Davis & Co., 362 U.S. at 43, 80 S.Ct. at 511.

Thus, a comprehensive and firmly enforced retail price policy, resulting in some cases in unwilling compliance by retailers, constitutes a violation. Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968). "[A] supplier may not use coercion on its retail outlets to achieve resale price maintenance. * * * [I]t matters not what the coercive device is." Simpson v. Union Oil Co., 377 U.S. at 17, 84 S.Ct. at 1054.

Where the customers' acquiescence in the suggested prices of the manufacturer is not "a matter of individual free choice prompted alone by the desirability of the product", an agreement or combination in violation of the antitrust laws may be found. United States v. Parke, Davis & Co., 362 U.S. at 47, 80 S.Ct. at 513. The manufacturer may not induce the acquiescence of some retailers by promising the adherence of others or institute a program of making threats or a system for detection and reporting. United States v. Parke, Davis & Co., *supra;* Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 60 S.Ct. 618, 84 L. Ed. 852 (1940); FTC v. Beech-Nut Packing Co., 257 U.S. 441, 42 S.Ct. 150, 66 L. Ed. 307 (1922).

Mere complaints by a manufacturer's customers that retailers are engaging in price-cutting or discounting do not in themselves constitute a combination and violation of Section 1. Interphoto Corp. v. Minolta Corp., 295 F.Supp.

at 719, n. 3; Carbon Steel Products Corp. v. Alan Wood Steel Co., 289 F.Supp. 584 (S.D.N.Y.1968); and cf. Klein v. American Luggage Works, Inc., 323 F.2d 787, 791 (3d Cir. 1963). However, if a manufacturer reacts to such complaints by cutting off the offending retailers, a conspiracy or combination may be found to exist. And if the manufacturer goes still further and induces the retailers to discontinue their discounting practices, the requisite agreement is apparent. United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1959); FTC v. Beech-Nut Packing Co., 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307 (1922).

■ Once the previous affirmative efforts of the manufacturer to secure compliance with its suggested retail prices have been shown sufficiently to estab-lish the existence of an unlawful conspiracy or combination, then a refusal to deal, undertaken in pursuance of the conspiracy or combination, transgresses the antitrust laws. United States v. General Motors Corp., 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852 (1940); Interphoto Corp. v. Minolta Corp., 295 F. Supp. 711 (S.D.N.Y.1969).

Turning now to the case at bar, the relevant products include numerous items.[1] Although defendant's "Keds" and "Kedettes" have sustained a loss in their share of the market, defendant has sold these products to between 25,000 and 30,000 retailers at any given time during the period of the alleged conspiracy,[2] through over 200 salesmen across the country.[3]

1. Both the "Keds" and "Kedettes" lines of canvas footwear comprise many different styles and types, each of which has its own name and code number. In 1963, for example, defendant offered for sale over 100 different "Keds" styles and over 50 different "Kedettes" styles. Many of these styles included a number of different colors as well as a full range of sizes and widths.

2. During the past three years, defendant has sold "Keds" and "Kedettes" (or both) to retailers whose number has totalled:

    1966    28,801
    1967    27,435
    1968    24,461 (first six months).

Although precise data are not available, a reliable, conservative estimate by the defendant places the total number of retailers to whom it has sold "Keds", "Kedettes", or both at over 25,000 for each year since 1958.

3. These salesmen, sometimes called sales representatives, have numbered between 200 and 225 in recent years, each being assigned to a geographical area called a territory. The salesmen work under the supervision of district sales managers. Defendant has assigned each district sales manager to a geographical area called a district, sometimes referred to as a "redline" district. Each such manager has his headquarters within his district at a local office called a branch. Branches have been located in various cities through-out the country. Each district sales manager has a number of salesmen reporting to him and he assigns to each of them a territory within his district. The district sales managers report to regional sales managers, each of whom is located within the region and supervises a number of district sales managers. Regional managers report to the manager of branch sales, who is stationed at defendant's principal office in New York City. Until April 17, 1962, the manager of branch sales reported to the general sales manager of the footwear and general products division. The latter reported to the general manager of that division, then a corporate vice president. Since April 18, 1962, the manager of branch sales reports to a divisional vice president of the consumer and industrial products division. The latter reports to the president of that division, who reports to the president of the corporation, Uniroyal's chief executive officer.

Defendant compensates all of its sales employees in a manner calculated to encourage them to increase the volume of "Keds" and "Kedettes" sales. The manager of branch sales, each regional sales manager, each district sales manager and each sales representative receive a fixed salary plus an annual bonus. The bonus represents a substantial fraction of the employee's income and is directly proportional to the volume of sales produced by him, or, in the case of a manager, by his subordinates. Defendant also uses

It is against this background that we must view the thirty-eight incidents of violations of the Sherman Act by resale price maintenance acts or interference with disposition of merchandise sold to a retailer which the proof established. These occurred in sixteen [4] of defendant's other means to encourage its sales employees to increase sales volume and to expand distribution by opening new accounts.

4. The incidents proven, classified by branch, are as follows:

| Branch Location | Date | Specific Location |
| --- | --- | --- |
| Los Angeles, Cal. | 1958 | San Diego, Cal. |
|  | 1960 | Santa Monica, Cal. |
| Denver, Colo. | 1963 | Lamar, Colo. |
|  | 1964 | Boulder, Colo. |
| Miami, Fla. | 1959–65 | Pompano Beach, Fla. |
| Atlanta, Ga. | 1962 | Cordele, Ga. |
| Kansas City, Kan. | 1960–64 | C. R. Anthony (see below) |
|  | 1961 | Topeka, Kan. |
|  | 1961 | Topeka, Kan. |
| New Orleans, La. | 1958 | New Orleans, La. |
| Baltimore, Md. | 1960 | Roanoke, Va. |
| Boston, Mass. | 1958 | Waltham, Mass. |
|  | 1958 | Hartford, Conn. |
|  | 1958–61 | Conn. and Mass. |
|  | 1961 | Conn. and Mass. |
|  | 1961 | Torrington, Conn. |
|  | 1962 | Gloucester, Mass. |
|  | 1962 | Winchester, Mass. |
|  | 1962 | Fall River, Mass. |
|  | 1962 | Boston, Mass. |
| St. Louis, Mo. | 1960 | Berland (see below) |
|  | 1960–62 | Berland (see below) |
| Buffalo, N. Y. | 1958–64 | Buffalo, N. Y. |
|  | 1958–67 | Hamburg, East Aurora, N. Y. |
|  | 1962 | Berland, Cheektowaga, N. Y. (see below) |
| New York, N. Y. | 1961 | Berland, Levittown, N. Y. (see below) |
| Cincinnati, O. | 1958 | Elwood, Ind. |
|  | 1961 | Kenwood, O. |
|  | 1961 | Dayton, O. |
|  | 1961 | Cincinnati, O. |
|  | 1962 | Newark, O. |
| Pittsburgh, Pa. | 1958 | Charleston, W. Va. |
|  | 1962 | Charleston, W. Va. |
| Dallas, Tex. | 1958 | Marfa, Tex. |
| Houston, Tex. | 1963 | Austin, Tex. |
| Seattle, Wash. | 1954 | Bellevue, Wash. |
|  | 1962 | Seattle, Wash. |
|  | 1963 | Renton, Wash. |

———◆———

C. R. Anthony is a chain of department stores in 21 or 22 states west of the Mississippi River comprised of 310 stores and with its headquarters in Ok-

twenty-five then existent branches.[5] The defendant's conspiratorial conduct actually proven over a period exceeding a decade involved slightly over fifteen one-hundredths of one percent (0.15%) of the total number of customers on defendant's books at any given point in that period.[6] Of the thirty-eight episodes proven, nine arose in or prior to 1962 in the Boston Branch area while Kenneth M. Kaligian was Assistant District Sales Manager or District Sales Manager. Thus, one of defendant's then twenty-five branches contributed almost one-fourth of the incidents proven by the Govern-

ment. Five other episodes occurred in or prior to 1962 in the Cincinnati Branch area, in which John R. Eble was the District Sales Manager. Cincinnati, then, contributed almost one-eighth of the incidents proven. Together, these two branches account for almost thirty-seven percent of the violations of the Sherman Act charged to defendant.

Nineteen alleged episodes, in thirteen branches, adduced by the Government as evidence of unlawful resale price interference, coercion or agreements are resolved on the facts and issues of credibility against the Government and in

lahoma City, Okla. Berland Shoes, Inc., a subsidiary of Genesco, is another multi-outlet chain which operates leased shoe departments in stores across the country. Both are known discount operations. However, the violations in connection therewith centered not only around prices but also around transshipment by

these customers of "Keds" and "Kedettes" to other of their outlets outside of the territory of the Uniroyal branch that had initially sold them the shoes. Defendant has since accommodated its distribution operation to the needs of chains such as these.

5. Defendant's footwear branches from 1958 to date, listed in alphabetical order by state, are:

| | |
|---|---|
| Los Angeles, Cal. | St. Louis, Mo. |
| San Francisco, Cal. | Omaha, Neb. (closed May 31, 1967) |
| Denver, Colo. | Newark, N. J. |
| Miami, Fla. | Buffalo, N. Y. |
| Atlanta, Ga. | New York, N. Y. |
| Chicago, Ill. | Cincinnati, O. |
| Kansas City, Kan. | Cleveland. O. (closed July 1, 1967) |
| New Orleans, La. | Philadelphia, Pa. |
| Baltimore, Md. | Pittsburgh, Pa. |
| Boston, Mass. | Dallas, Tex. |
| Detroit, Mich. | Houston, Tex. |
| Minneapolis, Minn. | Seattle, Wash. |

Milwaukee, Wis. (opened 1961, closed Dec. 31, 1966).

6. This percentage was calculated using 25,000 as the number of retail customers. Initially the Government filed 68 proposed findings of which 58 represented alleged factual episodes of efforts by defendant to suppress price-cutting practices or to restrict resale or reshipment of its products or both. Some of these incidents were not proved by credible evidence and some were withdrawn. Had the Government proven every one of these incidents and withdrawn none, it would have shown an adverse effect on less than two-tenths of one per cent (.2%) of defendant's customers.

favor of the defendant.[7] Two of these episodes were charged against the Newark, New Jersey branch as to which no other proof of violations was offered by the Government. Additionally, defendant has conclusively shown that retail resale pricing has been free of interference by defendant for at least the past five to six years in the major metropolitan regions.[8]

The present case, involving *de minimis* economic consequences of isolated pricing practices adopted by a few salesmen contrary to their employer's unequivocal instructions, is to be sharply distinguished from the broad restrictive impact on competition resulting from a pervasive price-fixing scheme designed to impose market-wide controls over the prices at which the manufacturer's goods are sold. *E. g.*, Simpson v. Union Oil Co., 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964); United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1959); and Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911).

In this case, the violations were not indicative of any national price-fixing scheme. There were no express, written resale price-fixing agreements. There was no attempt at the higher levels of the defendant's organization to enforce or cause to be enforced a price structure upon the retail tradesmen.

In addition, there is other evidence which suggests the absence of any plan or intention to enforce suggested retail

---

**7.** The Government failed to establish with credible proof that violations occurred in the following episodes charged:

| Branch | Date | Specific Location |
|---|---|---|
| Los Angeles, Cal. | 1958 | Norwalk, Cal. |
| | 1960, 1962 | Norwalk, Cal. |
| San Francisco, Cal. | 1961 | Oakland, Cal. |
| Miami, Fla. | 1961 | St. Petersburg, Fla. |
| Kansas City, Kan. | 1966 | Kansas City, Mo. |
| New Orleans, La. | 1960 | New Orleans, La. |
| | 1963 | Hattiesburg, Miss. |
| Baltimore, Md. | 1961–66 | Pulaski, Va. |
| Boston, Mass. | 1959 | Waltham, Mass. |
| Newark, N. J. | 1963 | Teaneck, N. J. |
| | 1963 | Englewood, N. J. |
| Buffalo, N. Y. | 1962 | Binghamton, Utica, N. Y. |
| Cincinnati, Ohio | 1961 | Wilmington, Ohio |
| | 1961 | Cincinnati, Ohio |
| Pittsburgh, Pa. | 1958 to date | Keystone Stores Chain |
| Dallas, Tex. | 1960 | Kermit, Tex. |
| Seattle, Wash. | 1954 | Bellevue, Wash. |
| | 1960 | Helena, Mont. |
| | 1963 | Chehalis, Wash. |

---

**8.** The Government has conceded that it has no direct evidence of violations of the antitrust laws in the Cleveland, Detroit and Chicago branches. Defendant's evidence clearly established the existence of a competitive atmosphere and freedom from restraint or interference with retail pricing in the Chicago branch as well as in New Jersey and Pennsylvania. Defendant also showed the absence in New York City, Missouri, Massachusetts and California of restraint on or interference with retail pricing.

prices. For example, defendant has never signed or had in effect any agreement fixing retail prices of "Keds" or "Kedettes" under any fair trade law. Nor has defendant ever attempted to enter into any such agreement. The inference suggested above to be drawn from this is demonstrated by United States v. Arnold, Schwinn & Co., 237 F.Supp. 323, 331–332 (N.D.Ill.1965), rev'd on other grounds, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967).

Defendant has not "preticketed" "Keds" or "Kedettes" or otherwise marked any such product, its container or display material with a retail price, coded or uncoded. See FTC v. Beech-Nut Packing Co., 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307 (1922); Klein v. American Luggage Works, Inc., 323 F.2d 787 (3d Cir. 1963); and United States v. Serta Associates, Inc., 296 F.Supp. 1121 (N.D.Ill.1968).

Defendant has engaged in national advertising and promotion of "Keds" and "Kedettes" without referring to retail prices. Defendant has provided television stations with visual and audio material intended for broadcasting on fashion and similar programs. These releases have referred to retail prices, but in almost every case, the reference has properly been in terms of an approximation. United States v. Serta Associates, Inc., *supra.*

Defendant has made available to all retail merchants to whom it sells "Keds" or "Kedettes" advertising mats showing the price for the advertised product as "$0.00". This has allowed the retailer to insert whatever price he wished when arranging to have the advertisement printed.

Defendant has also made available to retailers price tags for use in window and other displays. These tags bear the name "Keds", but leave a blank space in which the retailer may insert the price upon which he decides. See, Susser v. Carvel Corp., 332 F.2d 505 (2d Cir. 1964), cert. dismissed, 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965).

Finally, the defendant has sold to retailers quantities of discontinued styles which have competed with current styles. Defendant has not suggested retail prices for such discontinued merchandise. Some of the defendant's district sales managers have encouraged the salesmen to seek out and sell "Keds" and "Kedettes" to discount houses or to other retailers who habitually sell at reduced prices for the purposes of increasing volume of sales.

Other courts, faced with factual situations not dissimilar to the one existing in the case at bar, have failed to find a violation of law.

In *Schwinn*, at 237 F.Supp. 331–332, Judge Perry wrote:

The plaintiff has failed to prove the vital part of the price-fixing conspiracy upon which plaintiff has through counsel most diligently and fervently persisted. But dedication, sincerity and hard work cannot supply evidence. When a few witnesses come in and tell orally of fixed prices and threats, and then the records of actual sales come in literally from scores of retailers, the court has no alternative but to find there was no price-fixing scheme through a conspiracy between the defendants or otherwise. This court is convinced and the record of the evidence shows that the defendant Schwinn devoutly hoped that its retail franchisees would hew close to the suggested price list, but it also shows that, whatever some officer or representative may have said or written, when retailers met competition in interbrand or even intrabrand bicycles, no action was taken by Schwinn or any of the distributors or agents of either.

In United States v. Hudnut, 8 F.2d 1010 (S.D.N.Y.1925), Judge Augustus N. Hand commented:

It is hardly useful to review in detail the 73 cases of retailers to whom the defendant sold its goods, and who were cut off for price-cutting, and reinstated. These are but a small frac-

tion of 40,000 customers, who purchased its perfumes and toilet articles. * * *

On the whole, there were among the 73 cases very few instances indeed where Hudnut's salesmen, even with the inevitable enthusiasm of such persons, did anything like make an agreement to fix a resale price. * * *

The government has been treated with unusual frankness and given full access to the defendant's files. If some salesmen have occasionally done things which may merit criticism * * * there is no body of transactions which merit condemnation for violation of the Sherman Act.

Also worthy of note here is the view taken by Chief Judge Kirkpatrick in United States v. Kohler Co., 1953 Trade Cas. ¶ 67,453, at p. 68,289 (E.D.Pa.1953):

[I]n a business, as extensive as the present defendant's sporadic instances of attempted restraint of competition on the part of a few sales representatives is insufficient to fix responsibility for any violation of the law upon the principal.

See also Judge Nordbye's exhaustive examination of the amount and quality of the oral and documentary evidence adduced by the Government in United States v. J. I. Case Co., 101 F.Supp. 856, 865 (D.Minn.1951).

Here, the Government's evidence of isolated instances of improper pricing practices, though very weak, is barely sufficient, quantitatively and qualitatively, to establish an infraction of the Sherman Act.

Nor is the defendant relieved of responsibility for the unlawful occurrences by reason of the fact that they were episodes of unauthorized conduct on the part of sales personnel.

There is evidence on the record of awareness of and even participation in these events by regional and national personnel.

Moreover, defendant's arguments that the nature of its business necessitates the granting of a large amount of autonomy to the district sales managers offers some proof that those managers who participated in the wrongful acts proven here acted well within the authority given them.

Liability may be imposed upon a corporation for the acts of its agents, contrary to their orders and without authority, express or implied, merely because they were committed in the course of the corporation's business and within the scope of the agents' employment. United States v. Kemble, 198 F.2d 889, 893 (3d Cir.) cert. denied 344 U.S. 893, 73 S.Ct. 211, 97 L.Ed. 690 (1952).

This is not an instance of *respondeat superior*; it is one of the non-performance of a non-delegable duty. A corporation has a responsibility to eliminate unlawful practices by its salesmen and branch managers in the course of their routine labors—the selling of the corporation's products—even if the extent of its business precludes the personal supervision of high level officers who, as a result, rely upon written and oral instructions to their subordinates to insure that their policies will be carried out. The corporation must, in such circumstances, stand or fall on those whom these officers select to act for it, even where the latter have gone to considerable lengths to furnish the salesmen and branch managers with guidelines of the applicable legal requirements. United States v. Armour & Co., 168 F.2d 342, 343–344 (3d Cir. 1948).

The salient fact is that there has been at least one incident of unlawful resale price maintenance or conduct in aid thereof in sixteen of defendant's then twenty-five branches. These incidents either directly involved branch office personnel or occurred with the knowledge and acquiescence of such personnel, or under circumstances in which it was the business duty of such personnel to have such knowledge. Cf. United States v. Armour & Co., *supra*, at 343.

The purpose of the Act is a deterrent one; and to deny the possibility of

corporate responsibility for the acts of minor employees is to immunize the offender who really benefits, and open wide the *door* for evasion. United States v. George F. Fish, Inc., 154 F.2d 798, 801 (2d Cir., Judge Clark), cert. denied, 328 U.S. 869, 66 S.Ct. 1377, 90 L.Ed. 1639 (1946).

Even if the incidents proven are *de minimis* when compared to the vast number of retail outlets that defendant sells its products to, the episodes were sufficient in number to have warranted sterner policing by the defendant of the conduct of its employees during the years in question.

However, as this defect in defendant's sales and distribution system has been corrected, the question arises as to what if any, type of relief is now appropriate.

The Government contends that the burden is on defendant to show by clear and convincing evidence that there has been a complete abandonment of its unlawful practices and that there is no reasonable probability or expectation of their resumption. For this proposition, the Government relies chiefly on United States v. W. T. Grant Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953) and United States v. Oregon State Medical Soc., 343 U.S. 326, 72 S.Ct. 690, 96 L. Ed. 978 (1942). In the latter case, Mr. Justice Jackson wrote, at p. 333, 72 S.Ct. at p. 695:

> When defendants are shown to have settled into a continuing practice or entered into a conspiracy violative of antitrust laws, courts will not assume that it has been abandoned without clear proof. Local 167 [of International Brotherhood of Teamsters, etc.] v. United States, 291 U.S. 293, 298, [54 S.Ct. 396, 398, 78 L.Ed. 804]. It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption.

Cf. United States v. United States Steel Corp., 251 U.S. 417, 445 [40 S.Ct. 293, 297, 64 L.Ed. 343].

The Supreme Court, however, affirmed the denial of an injunction in that case because defendants had demonstrated "an overt and visible reversal of policy, carried out by extensive operations which have every appearance of being permanent because wise and advantageous * * *." 343 U.S. 334, 72 S.Ct. 696.

In *Grant* the Court said:

> [T]he court's power to grant injunctive relief survives discontinuance of the illegal conduct. [Citations] The purpose of an injunction is to prevent future violations, [Citation] and, of course, it can be utilized even without a showing of past wrongs. But the moving party must satisfy the court that relief is needed. The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive. * * * To be considered are the bona fides of the expressed intent to comply, the effectiveness of the discontinuance and, in some cases, the character of the past violations. 345 U.S. 633, 73 S.Ct. 897.

The Supreme Court affirmed the denial of an injunction in *Grant* despite the fact that five years of administrative attempts to convince defendant of the illegality of its practices had preceded the bringing of the suit. "Postponement of suit indicates doubt on the prosecutor's part as much as intransigence on the defendant's." 345 U.S. 634, 73 S.Ct. 898.

The problem with the Government's prayer for injunctive relief is that the Court is not satisfied that such relief is needed.

Of the thirty-eight incidents proven by the Government, only five occurred in 1964, the year of the filing of the complaint herein, or later.[9] Four additional

---

9. One incident occurred in Boulder, Colo. in 1964. The other four of these incidents were continuations of older practices into the year 1964: one in Hamburg

incidents occurred in 1963.[10] All of the remaining twenty-nine episodes terminated at least a year and a half before the filing of the complaint, in June, 1964. Eight[11] of these terminated before 1960 and, therefore, can be considered ancient history in relation to the question of whether to grant injunctive relief. This leaves the bulk of the incidents proven as occurring in the period 1960–1962 inclusive. The persons involved in most of these episodes have either left defend-ant's employ or have been transferred to positions not involving district sales responsibilities.

In fourteen of the sixteen branches in which violations were established, defendant's evidence has convincingly shown that the price maintenance and and restrictive distribution practices have been discontinued in the area and that vigorous price competition is now prevalent.[12] In each of the two remain-

and East Aurora, N. Y. (Buffalo branch) began in 1958 and extended into 1967; another Buffalo incident began in 1958 but the witness was unable to fix dates later than that year for any conversations evidencing the alleged agreements and the Court has therefore fixed 1964, when the employment of the salesman involved was terminated, as the date ending the incident; an incident in Pompano Beach, Fla. (Miami branch) occurred during the period 1959 to 1965; finally, an incident involving C. R. Anthony (Kansas City branch) began in 1960 and ended in 1964.

10. One was in Lamar, Colo. (Denver branch); another involved Berland (St. Louis branch); a third was in Austin, Tex. (Houston branch); and the fourth was in Renton, Wash. (Seattle branch).

11. These are: Los Angeles branch, 1958 (San Diego, Cal.); New Orleans, La., 1958; Boston branch, 1958 (two incidents, in Waltham, Mass. and Hartford, Conn.); Cincinnati branch, 1958 (Elwood, Ind.); Pittsburgh branch, 1958 (Charleston, W. Va.); Dallas branch, 1958 (Marfa, Tex.); Seattle branch, 1954 (Bellevue, Wash.).

12. In each of these fourteen branches the current situation is clear: there is, and has been for years, a general prevalence of price-cutting and an absence of any resale price maintenance or interference with retail pricing.

There is substantial evidence that the two episodes proven in the Los Angeles branch area were isolated instances and not part of a general pattern. Extensive proof of price competition and advertising since 1960 has been presented for this area.

There is substantial evidence for the Denver branch area that no resale price maintenance has occurred and that price cutting has been unimpeded since April 30, 1967, the date on which T. S. Newton was replaced as District Sales Manager.

which position he had held during the two incidents proven there.

There were a number of instances proven for the Miami branch area of discount price advertising.

In the Kansas City branch area, there has been proof of discount price advertising and, in addition, retailers have been affirmatively advised since 1965 that they are free to charge whatever prices they desire. Since March, 1964 C. R. Anthony has been entirely free of restrictions on pricing and transshipment. There has been no agreement similar to the one which existed prior to that date.

Vigorous competition in the Baltimore branch area was demonstrated by the 1968 advertising and testimony of David Allen and by other applicable evidence.

On August 21, 1962, Kenneth M. Kaligian, the District Sales Manager of the Boston branch, was replaced. The evidence is clear that since his removal the local retailers have been free of retail price interference from the defendant. In addition, Kenneth B. Miller, a Boston branch sales representative and author of several Government exhibits, left defendant's employ on December 31, 1966. The latter events in this branch are set out more fully above.

As to the Missouri and New York City branches, defendant has proven that Berland resumed buying the products that defendant had withheld from it around the middle of 1963. Since that time there has been so interference with Berland's pricing or transshipment. Widespread price-cutting among retailers has been proved in New York City (Manhattten, Queens, Brooklyn, Bronx).

In August, 1968, Stanley H. Kieon took over the Buffalo branch and merchandise has since been sold in that area without any resale price restrictions. His predecessor, R. F. Kurrasch, had created difficulties.

On November 1, 1967, John R. Eble, the District Sales Manager of the Cincinnati

ing branches, only a solitary, isolated incident was shown to have occurred.[13]

The Government relies almost exclusively on its proof of these pre-suit violations to support its prayer for injunctive relief.

Defendant, on the other hand, submitted evidence on its current resale pricing practices and contemporary conditions in the marketplace. The upshot of this evidence, which has not been controverted by the Government with any substantial proof, is that defendant is neither presently violating Section 1 of the Sherman Act nor is likely to do so in the future.

Defendant has placed in evidence discount price advertisements which appeared publicly on occasions in eighteen states in the years 1962 through 1968.[14] But it is the other evidence submitted by defendant which explains and amplifies the force and effect of these advertisements.

Defendant's business has changed considerably in recent years. Imports and other brands have been introduced into the market which have drastically reduced Uniroyal's share of the market in this country. Brands that are considerably lower priced have become important factors in the business. The market requirements involve a greater variety of styles, colors, widths and shapes and it becomes a much more difficult selling job to sell in this market.

Furthermore, in recent years mass merchandising and the big chain operation and discounters have become a very important part of the marketplace. Retail customers are prone to go to shopping centers in the suburbs and shopping plazas and to chain operations and to the large discount operations to buy their canvas footwear.

Defendant's extensive evidence on the current situation in the Boston branch is indicative of the general contemporary

branch, was removed and placed in a position that has no responsibility for sales of "Keds" or "Kedettes".

The evidence shows that since 1964 there has been no interference with retail pricing in West Virginia (Pittsburgh branch), two incidents having been proven in that area prior to that date.

On September 30, 1967, J. C. Beavers was replaced as the District Sales Manager of the Dallas branch. A series of letters and invoices demonstrated that the Houston branch, among others, does not interfere with transshipments of "Keds" and "Kedettes" even where the retailer involved (as revealed by his advertisements) is a price-cutter. Indeed, Houston aids such shipments. The only concern of the District Sales Man-

ager there is with sales credits and commissions.

As to the Seattle branch, defendant has established that since 1965 it has not even suggested prices. Competitive advertising and the absence of any interference with retail pricing have been demonstrated in that area.

13. Neither the 1962 incident in the Atlanta branch nor the 1958 incident in the New Orleans branch was shown to be a typical occurrence in those areas. Certainly the latter incident is remote indeed when considered as part of a request for injunctive relief. Neither incident provides the basis for an inference of the existence of an ongoing practice for which this remedy would be appropriate.

14. The states involved, listed in alphabetical order with the dates of the advertisements proven, are:

| | |
|---|---|
| Arkansas (1968) | New Jersey (1968, 1969) |
| California (1963, 1966–68) | New York (1965, 1968) |
| Colorado (1967, 1968) | North Carolina (1966–68) |
| Florida (1965, 1967, 1968) | Ohio (1966, 1968) |
| Hawaii (1968) | Pennsylvania (1962–63, 1965–66) |
| Kansas (1966) | Texas (1966) |
| Louisiana (1965) | Utah (1968) |
| Maryland (1968) | Washington (1966) |
| Massachusetts (1962, 1968) | Wisconsin (1966). |

state of affairs and bears detailed review here.

With the removal of the branch sales manager of the Boston district in 1962 a radical change in the conduct of defendant's business in that area took place. The new sales manager made an investigation of the marketing conditions. He determined that the area was subject to a trend toward the mass merchant and the discount and chain-type of operation. He organized the territories of the salesmen, held meetings individually and on a group basis with the latter to outline what was expected of them, replaced some of them and proceeded to sell a large number of so-called marginal accounts. The men were told that such selling was part of their responsibility to increase the total volume and the line was offered to and business was obtained from several chain and discount price-cutting operators.

The subject of suggested retail prices came up during training sessions specifically and the salesmen were pointedly advised that the prices were suggested and that they were not to be enforced. Complaints received in the Boston area after 1962 from retailers complaining of their competitors were responded to with the statement that the goods were not fair-traded and that the defendant had no way or desire to enforce the suggested retail price. Sometimes the complaint would just be ignored and left to die a natural death by letting it go unanswered. Other forms of responses were utilized but in sum they indicated that resale price maintenance was a thing of the past in this area. The Boston branch numbered among its accounts some 1,800 to 1,900 retailers. The evidence persuasively indicated that the new district sales manager for this branch eliminated from 1962 on any price coercion or restrictions on the purchasers of the merchandise with respect to their sale or transfer of that merchandise.

The emphasis of defendant's top executive sales personnel is on selling and producing sales and not on handling the complaints of retailers with respect to their competitors. The current philosophy is that enforcement or policing of retail prices is a complete waste of a salesman's or manager's time since it is nonproductive. The defendant now would rather have the business at any price rather than to lose the business to its competitors as a result of attempts to control resale prices. The corporation's policy and plan for non-enforcement of suggested retail prices has been confirmed through authorization of its top management in the form of a promise placed on the record.

The policy of defendant since at least 1962 has been to instruct and train its sales managers or salesmen not to interfere with retail prices or the freedom of a retailer to sell at whatever price he chooses. Defendant's national sales executives have conducted meetings and training programs for the sales managers and salesmen at which the latter were informed and instructed that it was the policy of the defendant not to interfere with resale prices or the transfer of merchandise from one to another district by a purchaser thereof. While defendant has never promulgated an oral or written policy or directive of any kind directing or encouraging enforcement of suggested retail prices, it has not until very recently issued any written statement of its policy of discouraging such enforcement. Defendant's recent practice has been to require its district sales managers to issue written directives to the local salesmen, explaining defendant's policy of non-interference with retail prices. Each district sales manager must report back his compliance with this requirement by filing with the main office a copy of the directive thus issued.

In recent years defendant's salesmen have generally conducted themselves in a manner indicative of absence of any attempt at enforcement of suggested retail prices. They have offered popular items in the "Keds" line to retailers, including discount houses, who have consistently advertised and sold them below defendant's suggested retail prices. Complaints by other retailers have reached the de-

fendant in respect thereof and defendant has not interfered with such advertising or selling.

The change in the competitive climate of the market as a result of the introduction of imports and other brands of canvas footwear, the absence of economic feasibility of resale price maintenance, the turnover of defendant's sales personnel and the curtailment of the activities of those who remain, the constantly greater reliance on discount houses and other unorthodox merchandisers, and the fact that defendant's strength in the marketplace and influence over retailers have waned considerably, are all persuasive of the contention that there is no likelihood that there will be violations in the future. United States v. San Diego Grocers Association, 1963 Trade Cas. ¶ 70,777 (S.D.Cal.1963).

Under these circumstances, the Court is persuaded that there is no cognizable danger of recurrent violation sufficient to warrant the issuance of an injunction in this case.

Accordingly, that branch of the Government's prayer which seeks injunctive relief is denied.

However, the Government also asks, in its complaint, that the Court adjudge and decree that defendant has violated the Sherman Act. The issues here are somewhat different from those determined in denying injunctive relief to the Government.

■ The determination necessary to the granting of injunctive relief, i. e., that there exists some cognizable danger of recurrent violation, is a determination that there exists a risk which is "something more than the mere possibility which serves to keep the case alive." United States v. W. T. Grant Co., 345 U.S. at 633, 73 S.Ct. at 898.

■ When the defendant is free to return to its old ways, as it is here, its voluntary cessation of illegal conduct does not make the case moot, even though there is no likelihood of resumption of unlawful conduct. The Court retains power to hear and determine the case be-

cause a controversy may remain which the public has an interest in having settled. Ibid. at 632, 73 S.Ct. 894. See also United States v. Concentrated Phosphate Export Ass'n, 393 U.S. 199, 203–204, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968), where the Supreme Court recently held that the controversy was not technically moot but that the trial judge had discretion on remand to determine whether an injunction should issue:

The test for mootness in cases such as this is a stringent one. Mere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave "[t]he defendant * * * free to return to his old ways." United States v. W. T. Grant Co., 345 U.S. 629, 632 [73 S.Ct. 894, 897, 97 L.Ed. 1303] (1953); see, e. g., United States v. Trans-Missouri Freight Assn., 166 U.S. 290 [17 S.Ct. 540, 41 L.Ed. 1007] (1897). A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur. But here we have only appellees' own statement that it would be uneconomical for them to engage in any further joint operations. Such a statement, standing alone, cannot suffice to satisfy the heavy burden of persuasion which we have held rests upon those in appellees' shoes. United States v. W. T. Grant Co., 345 U.S., at 633 [73 S.Ct. 894]. Of course it is still open to appellees to show, on remand, that the likelihood of further violations is sufficiently remote to make injunctive relief unnecessary. Id., at 633–636 [73 S.Ct. 894]. This is a matter for the trial judge.

There has understandably been some confusion over what, if anything, is the difference between (i), the absence of any "cognizable danger of recurrent violation" which leads to the denial of injunctive relief and (ii), the absence of a "mere possibility" that the wrong will be repeated that deprives a Court of the power to hear and determine a case alto-

gether. Cf. United States v. Ins. Bd., 144 F.Supp. 684 (N.D.Ohio 1956) and cases cited therein. The answer seems to have traditionally been found in the reasons behind the defendant's discontinuance of unlawful practices.

■ Such a discontinuance does not relieve a Court of the duty to pass on the question of legality where "by the mere volition of the parties the combination could come into existence at any moment." United States v. Hamburg-Amerikanische, 239 U.S. 466, 477, 36 S.Ct. 212, 216, 60 L.Ed. 387 (1916), citing United States v. Trans-Missouri Freight Ass'n, 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007 (1897). Where, however, the discontinuance was impelled by extrinsic circumstances beyond the defendant's control, a Court lacks power to decide the academic question left behind.

> Here, on the contrary, the business in which the parties to the combination were engaged has, by force of events beyond their control, ceased, and by the same power and [sic] a continued relation concerning it between them has become unlawful and impossible. The difference between this and the Trans-Missouri Case was clearly laid down in Mills v. Green, 159 U.S. 651 [16 S.Ct. 132, 40 L.Ed. 293], where, after announcing the general rule as to the absence of authority to consider a mere moot question, and referring to possible exceptions resulting from the fact that the want of actuality had arisen either from the consent of the parties or the action of a defendant, it was declared: "But if the intervening event is owing to the plaintiff's own act or to a power beyond the control of either party, the court will stay its hand."

239 U.S. at 477, 36 S.Ct. at 217.

■ There has been no showing on the record that the reason for defendant's voluntary cessation of its unlawful pricing practices was fear of suit brought about by the Government investigation in this case. Cf. United States v. Parke, Davis & Co., 362 U.S. 29, 48, 80 S.Ct. 503, 4 L.Ed.2d 505 (1959). The record suggests, as one reason for the change, decline of defendant's share of the relevant market in an increasingly competitive situation. The question before the Court, then, is whether the abandonment of unlawful price-maintenance practices due to a decision that such practices are economically unsound is "action by the defendant" or a result of a force beyond its control. If it is the latter, the case is moot and the complaint should be dismissed. If it is the former, the defendant should be adjudged to have violated Section 1 of the Sherman Act and the Court should retain jurisdiction for the granting of further relief, upon application of the Government, in the event of future violations. Cf. United States v. Parke, Davis & Co., 365 U.S. 125, 126, 81 S.Ct. 433, 5 L.Ed.2d 457 (1961).

The United States Supreme Court has twice indicated a preference for the latter course in cases where business considerations have prompted the defendant's reversal in policy. In United States v. United States Steel Corp., 251 U.S. 417, 40 S.Ct. 293, 64 L.Ed. 343 (1920), the Court affirmed the dismissal of the bill in a dissolution suit. The corporation there involved had failed to achieve the monopoly position it desired because it had underestimated the opposing market forces. The antitrust violations were instances scattered over ten years and had all been abandoned nine months before suit was brought.

> There is no evidence that the abandonment was in prophecy of or dread of suit; and the illegal practices have not been resumed, nor is there any evidence of an intention to resume them, and certainly no "dangerous probability" of their resumption * * *. And we may say in passing that the government cannot fear their resumption, for it did not avail itself of the offer of the District Court to retain jurisdiction of the cause in order that, if illegal acts should be attempted, they could be restrained.

251 U.S. at 445, 40 S.Ct. at 297.

Any doubt that existed as to whether the discontinuance of past price-maintenance practices for business reasons should be the subject of an adjudication of violation was erased by the history of the *Parke, Davis* case subsequent to the first remand by the Supreme Court. Pursuant to instructions to the District Court to issue an injunction unless the defendant submitted evidence to refute the Government's right to injunctive relief, the defendant submitted evidence which showed the futility of the continuation of the price-fixing practices. The defendant showed that it was now necessary to meet new competition and that the prior sales practices had been abandoned because they were ineffective. United States v. Parke, Davis & Co., 1960 Trade Cas. ¶ 69,776 (D.C.1960).

No appeal was taken from the denial by the District Court of injunctive relief but the Government did appeal from the omission from the order of any provision adjudging that defendant therein had violated the Sherman Act. 365 U.S. at 126, 81 S.Ct. 433. The Government argued that there was need for such an adjudication which would serve as the basis for treble damage suits under Section 4 of the Clayton Act and as an aid to facilitate the Government's own proceedings in the future. (See Brief for United States, pp. 5–7). The Supreme Court said:

> We * * * hold that * * * the Government is entitled to a judgment on the merits, as prayed in paragraph 1 of the section of the Complaint captioned "Prayer." We also hold that the District Court should retain the case on the docket for future action in the event the Government applies for further relief from an alleged resumption by Parke Davis of illegal activity.

365 U.S. at 126, 81 S.Ct. at 434.

In United States v. W. T. Grant Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953) a contrary result would seem, at first glance, to have been reached when the order of this Court was affirmed by the Supreme Court. Judgment for the defendants was entered therein because there was no threat that their terminated, unlawful conduct would be resumed. The Trial Judge wrote that:

> The suit is not continued a controversy merely because a decree of past violation is sought.
>
> United States v. W. T. Grant Co., 112 F.Supp. 336, 338 (S.D.N.Y.1952), aff'd, 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953).

*Grant,* however, involved interlocking directorates, a violation of Section 8 of the Clayton Act. In such a case there is not the residual public interest in having a violation adjudicated that there was in *Parke, Davis.* The practical difficulties in bringing a treble damage suit for such a Section 8 violation are so great as to render such suits a mere theoretical possibility.

■ Accordingly, the decree to be entered herein will adjudge that the defendant has violated Section 1 of the Sherman Act and this Court will retain the case on the docket for future action in the event that the Government applies for further relief from an alleged resumption by Uniroyal of illegal activity and, except as so granted, the prayers of the Government will be denied.

The foregoing together with footnotes shall constitute the findings of fact and conclusions of law required by Rule 52 (a), Fed.R.Civ.P.

Submit decree within fifteen days hereof, on notice.

So ordered.