**CORNING GLASS WORKS, Petitioner,**

v.

**FEDERAL TRADE COMMISSION, Respondent.**

**No. 73–1723.**

United States Court of Appeals, Seventh Circuit.

Argued April 18, 1974.

Decided Jan. 29, 1975.

Charles C. Parlin, Jr., New York City, for petitioner.

Norman Diamond, Washington, D. C., for amicus curiae.

Calvin J. Collier, Gen. Counsel, William A. E. Doying, Atty., F.T.C., Washington, D. C., for respondent.

Before CUMMINGS, STEVENS and SPRECHER, Circuit Judges.

STEVENS, Circuit Judge.

The Sherman Act condemns vertical, as well as horizontal, agreements in restraint of trade. However, by virtue of § 2 of the McGuire Act, two types of vertical agreements—those requiring a vendee to resell at prices fixed by his vendor, and those requiring the vendee to require his customers to resell only at fixed prices—are exempt from the antitrust laws if such agreements are lawful under applicable state law.[1] The question presented by this case is whether the state law which governs the legality of the latter type of agreement between a vendor and a vendee is that of the state where the vendee is located or that of the state or states where the vendee's customers are located. We have no doubt that the vendee's location is determinative for the latter, as well as the former, type of agreement.

I.

Corning Glass Works manufactures and distributes various trademarked products used in food preparation and service.[2] Corning sells to wholesalers located in 45 states and the District of Columbia; those wholesalers, in turn, sell to retailers who resell to consumers in all 50 states and the District.

Corning's form contract with its distributors contains a fair trade agreement obligating the wholesalers (a) to sell only at prices set by Corning, and (b) not to sell to any reseller unless such reseller has agreed with Corning to maintain Corning's fair trade prices.[3] These

---

1. Act of July 14, 1952, Pub.L.No.542, 66 Stat. 631–632, which amended § 5(a) of the Federal Trade Commission Act (15 U.S.C. § 45(a)(2)). There is no question that, absent such a statutory exemption, both types of vertical agreements violate § 1 of the Sherman Act (15 U.S.C. § 1) and § 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. § 45(a)(1)). *See* Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 386, 71 S.Ct. 745, 95 L.Ed. 1035; Federal Trade Commission v. Beech-Nut Packing Co., 257 U.S. 441, 453–455, 42 S.Ct. 150, 66 L.Ed. 307; United States v. Arnold, Schwinn & Co., 388 U.S. 365, 377–378, 87 S.Ct. 1856, 18 L.Ed.2d 1249; United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 721, 64 S.Ct. 805, 88 L.Ed. 1024.

2. The products are known as "Corning Ware," "Pyrex," and "Corelle." The Commission does not question the fact that these products are trademarked and are "in free and open competition with commodities of the same general class" within the meaning of 15 U.S.C. § 45(a)(2).

3. The relevant provisions in Corning's wholesale contracts are as follows:

   "6. FAIR TRADE AGREEMENT—As to each state and as to such sales where it is lawful so to agree (but not elsewhere or otherwise).

   (a) Distributor agrees that it will not (except as specifically permitted by statute) directly or indirectly advertise, offer for

agreements are only effective "as to each state and as to such sales where it is lawful so to agree." Since the legal effect of fair trade agreements varies from state to state, the Corning form contract has a varying impact on its wholesalers.

There are currently 14 states and Puerto Rico and the District of Columbia in which fair trade agreements are illegal as a matter of state, as well as federal, law; they are described as "free trade" states.[4] The remaining 36 "fair trade" states comprise two principal types. In each of the "non-signer" states the legislature has authorized judicial enforcement of fair trade prices even against sellers who have not signed a fair trade contract and has permitted the use of customer restriction clauses; there are currently 14 such "non-signer" states.[5] In the "signer-only" states—of

sale or sell any PYREX ware or CORNING WARE products at prices less than the fair trade prices now or hereafter designated and set forth in Schedule A less discounts listed in Schedule B applicable to the products sold. . . . .

(b) Distributor agrees that it will not sell or transfer PYREX ware or CORNING WARE products to any reseller unless such reseller has agreed with Corning to maintain Corning's fair trade prices.

"7. APPLICABLE LAW—This agreement, entered between Corning and Distributor at Corning, New York, is governed by the laws of the State of New York. The agreements contained in the Fair Trade Agreement set out in paragraph 6 hereof shall apply solely to sales, offers or advertisements only when and where agreements of the character of those therein contained shall be lawful as applied to intrastate transactions under any statute, law or public policy, now or hereafter in effect, in the state in which such resale is to be made or to which products are to be transported for such resale. In other states the prices referred to in paragraph 6 hereof are merely suggested as possible resale prices which may or may not be adopted for resale in those states in the sole discretion of the Distributor."

4. The free trade jurisdictions are:

| | |
|---|---|
| Alabama | Nebraska |
| Alaska | Nevada |
| District of Columbia | Puerto Rico |
| Hawaii | Rhode Island |
| Kansas | Texas |
| Mississippi | Utah |
| Missouri | Vermont |
| Montana | Wyoming |

5. The non-signer states are:

| | | |
|---|---|---|
| Arizona | Maryland | North Dakota |
| California | New Hampshire | Ohio |
| Connecticut | New Jersey | Tennessee |
| Delaware | New York | Virginia |
| Illinois | | Wisconsin |

A typical non-signer state fair trade act is that of Illinois:

"Section 1. No contract relating to the sale or resale of a commodity which bears, or the label or content of which bears, the trade mark, brand or name of the producer or owner of such commodity and which is in fair and open competition with commodities of the same general class produced by others shall be deemed in violation of any law of the State of Illinois by reason of any of the following provisions which may be contained in such contract:

(1) That the buyer will not resell such commodity except at the price stipulated by the vendor.

(2) That the producer or vendee of a commodity require upon the sale of such commodity to another, that such purchaser agree that he will not, in turn, resell except at the price stipulated by such producer or vendee.

\*  \*  \*  \*  \*  \*

"Sec. 2. Wilfully and knowingly advertising, offering for sale or selling any commodity at less than the price stipulated in any contract entered into pursuant to the provisions of section 1 of this Act, whether the person so advertising, offering for sale or selling is or is not a party to such contract, is unfair competition and is actionable at the suit of any person damaged thereby.

"Sec. 3. This Act shall not apply to any contract or agreement between producers or between wholesalers or between retailers as to sale or resale prices.

The provision of this Act shall not apply to any contract or agreement relating to any commodity which may be sold or offered for sale to the State of Illinois or to any of its administrative agencies or political subdivisions, or to any municipality, or to any free public library, endowed library, college, university or school library in this State." Act of July 8, 1935, Laws of 1935, p. 1436, as amended by Act of June 25, 1941, Laws of 1941, p. 1115. Ill.Rev.Stat. 1973, ch. 121½, §§ 188–190.

which there are currently 22—either the courts have refused, usually on state constitutional grounds,[6] to enforce the statutory remedy against non-signers, or, in some instances, no remedy against non-signers has been provided by the state legislature. In either event, in such a state a fair trade agreement is lawful although it is enforceable against the "signer only." With the exception of Maine, each of these "signer-only" states also authorizes the use of customer restriction clauses.[7]

The problem presented by this case has assumed significance as the number of "free trade" and "signer-only" states has increased. For it principally involves the validity of Corning's customer restriction clause as applied to wholesalers in free trade states who sell to retailers in signer-only states. Does § 2 of the McGuire Act legalize Corning's attempt to require those wholesalers to refuse to sell to retailers in fair trade states who have not agreed to maintain Corning's fair trade prices?

In Count II of its five-count complaint against Corning,[8] the Commission took the position that this requirement is a non-exempt restraint of trade forbidden by § 1 of the Sherman Act, and therefore unlawful under § 5(a)(1) of the Federal Trade Commission Act. Based on a stipulated record, the Administrative Law Judge dismissed all counts of the complaint, but on appeal the Commission unanimously reversed as to Count II and issued its cease and desist order.[9] The case is here on Corning's petition for review, claiming that the Commission misconstrued the McGuire Act and that, in all events, the Commission's order was "unnecessarily punitive." We find no merit in Corning's position.

6. *See*, for example, Corning Glass Works v. Ann & Hope, Inc. of Danvers, 294 N.E.2d 354, 361–363 (Mass.1973), holding the Massachusetts non-signer provisions invalid as an unlawful delegation of legislative power to private persons. Justice Braucher's opinion describes the trend of decisions in other states as well.

7. The signer-only states are:

| | | |
|---|---|---|
| Arkansas | Kentucky | North Carolina |
| Colorado | Louisiana | Oklahoma |
| Florida | Maine | Oregon |
| Georgia | Massachusetts | Pennsylvania |
| Idaho | Michigan | South Carolina |
| Indiana | Minnesota | South Dakota |
| Iowa | New Mexico | Washington |
| | | West Virginia |

A typical signer-only state fair trade act is that of Arkansas:

"No contract relating to the sale or resale of a commodity which bears, or the label or container of which bears, the trademark, brand, or name of the producer or distributor of such commodity and which commodity is in free and open competition with commodities of the same general class produced or distributed by others shall be deemed in violation of any law of the State of Arkansas by reason of any of the following provisions which may be contained in such contract:

(a) That the buyer will not resell such commodity at less than the minimum price stipulated by the seller.

(b) That the buyer will require of any dealer to whom he may resell such commodity an agreement that he will not, in turn, resell at less than the minimum price stipulated by the seller.

(c) That the seller will not sell such commodity:

(1) To any wholesaler, unless such wholesaler will agree not to resell the same to any retailer unless the retailer will in turn agree not to resell the same except to consumers for use and at not less than the stipulated minimum price, and such wholesaler will likewise agree not to resell the same to any other wholesaler unless such other wholesaler will make the same agreement with any wholesaler or retailer to whom he may resell; or

(2) To any retailer, unless the retailer will agree not to resell the same except to consumers for use and at not less than the stipulated minimum price." Acts 1937, No. 92, § 2, p. 345; Arkansas Stat.1947, 1957 Replacement, Title 70, ch. 2, § 70–202.

8. Count I charged Corning with using its fair trade contracts to fix free trade state wholesaler minimum resale prices whenever these wholesalers sell to a fair trade state retailer. Count III alleged that Corning has required wholesalers in signer-only fair trade states to refuse to sell to retailers who fail to sign fair trade contracts with Corning. Count IV alleged that Corning worded its fair trade contracts so as to obfuscate the circumstances in which price and customer restrictions are applicable. Count V charged Corning with establishing an illegal quantity discount schedule.

9. The parties had stipulated that relief could also be granted on Counts I and IV if the violation alleged in Count II were found.

## II.

The decision of this case depends upon the proper construction of the words "such resale" as used in the so-called "when lawful" clause in paragraph (2) of § 2 of the McGuire Act. Before quoting the relevant language, it is appropriate to note that the "when lawful" clause was originally enacted as part of the antitrust exemption contained in the Miller-Tydings Act [10] in 1937 and was retained verbatim when Congress broadened the vertical price-fixing exemption in 1952.

The principal ways in which the McGuire Act broadened the exemption were (1) by including the non-signer aspects of state fair trade legislation; [11] (2) by making the exemption applicable to stipulated, as well as minimum prices; [12] and (3) by adding an exemption for agreements requiring a vendee to limit his resales to persons who agree to maintain fair trade prices.[13] This last provision—the so-called "vendee clause"—is relevant to our problem.

To facilitate our explanation of our understanding of the second paragraph of § 2 of the McGuire Act, we italicize the portions of the paragraph which were not a part of the Miller-Tydings Act, we underline the "vendee clause" and the "when lawful" clause, and we print in bold face the word "resale"

which appears once in the phrase following the vendee clause and twice in the "when lawful" clause.

(2) Nothing contained *in this Act or in any of the Antitrust Acts* shall render unlawful any contracts or agreements prescribing minimum *or stipulated* prices, or requiring a vendee to enter into contracts or agreements prescribing minimum or stipulated prices, for the **resale** of a commodity which bears, or the label or container of which bears, the trade-mark, brand, or name of the producer or distributor of such commodity and which is in free and open competition with commodities of the same general class produced or distributed by others, when contracts or agreements of that description are lawful as applied to intrastate transactions under any statute, law, or public policy now or hereafter in effect in any State, Territory, or the District of Columbia in which such **resale** is to be made, or to which the commodity is to be transported for such **resale**. 66 Stat. 632; 15 U.S.C. § 45(a)(2).

As originally enacted in the Miller-Tydings Act, it is manifest that the word "resale" had the same meaning each time it was used. Since the vendee clause was not then a part of the statute, the word "resale" consistently referred to the first resale by a vendee,

---

10. Act of August 17, 1937, ch. 690, Title VIII, 50 Stat. 693–694; 15 U.S.C. § 1.

11. This change—made necessary by the Supreme Court's decision in Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035—was made in paragraph (3) of § 2 of the McGuire Act.

"(3) Nothing contained in this Act or in any of the Antitrust Acts shall render unlawful the exercise or the enforcement of any right or right of action created by any statute, law, or public policy now or hereafter in effect in any State, Territory, or the District of Columbia, which in substance provides that willfully and knowingly advertising, offering for sale, or selling any commodity at less than the price or prices prescribed in such contracts or agreements whether the person so advertising, offering for sale, or selling is or is not a party to

such a contract or agreement, is unfair competition and is actionable at the suit of any person damaged thereby." 66 Stat. 632; 15 U.S.C. § 45(a)(3).
The "vendee" clause and the "when lawful" clause, which we construe in this case, are found in paragraph (2) of § 2, quoted in the text *infra*.

12. Note the inclusion of the phrase "or stipulated" in paragraph (2) of § 2 of the Act, 15 U.S.C. § 45(a)(2), quoted *infra*.

13. The McGuire Act amendments were to § 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, and not to § 1 of the Sherman Act, 15 U.S.C. § 1, as was the Miller-Tydings Act. Nevertheless, the changes made in the McGuire Act were clearly intended to affect § 1 of the Sherman Act as well, as the "Nothing contained in this Act or in any of the Antitrust Acts . . ." language in paragraphs (2) and (3) of § 2 indicates.

rather than to any subsequent resale by a purchaser from the vendee, for at that time the exemption covered only the terms of the minimum resale price maintenance agreement between a vendor and his immediate vendee, and made no reference to agreements restricting the vendee's right to choose his own customers.

We have no doubt, therefore, that if the words "such resale" as used in the McGuire Act retain the same meaning as they did in the Miller-Tydings Act, the Commission is correct in its view that the legality of a customer restriction clause in an agreement between a manufacturer and a wholesaler is governed by the law of the state in which the wholesaler resells the trademarked article.

The question, then, is what change, if any, in the meaning of the word "resale" resulted from the insertion of the vendee clause in the forepart of the paragraph. Before attempting to answer this question, it is useful to note that the word "resale" performs two quite different functions. First, it is part of the description of the kind of agreements that are covered by the exemption, and, second, it is part of the identification of the states whose law determines whether the agreement is valid or invalid. There is no doubt about Congress' intent to modify its description of exempt agreements to include customer restriction clauses as well as price-fixing clauses. There is, however, no indication that Congress intended to make any change in the identity of the states whose laws would determine the availability of the

exemption, or to have the law of more than one state applicable to any one agreement. We first consider the meaning of the word "resale" as part of the description of covered agreements and then as part of the "when lawful" clause.

To make sense out of the vendee clause, and also to retain the significance of the price-fixing clause, it is necessary to give the word "resale" a double meaning in the phrase immediately following the vendee clause.[14] For, to the extent that the phrase modifies the price-fixing clause, it obviously still refers to the first resale by the immediate vendee; but to the extent that the same phrase modifies the vendee clause, it must refer to a resale by a person who has purchased from that vendee.[15] Unless the phrase performs this dual function, either the original price-fixing exemption would have been changed or else the vendee clause would be meaningless. The word "resale" as first used in paragraph (2) of § 2, therefore, has a different meaning in the two contexts in which it modifies its two antecedent clauses.

When the same word appears in the "when lawful" clause, logically it might have either of the two meanings it first conveyed, or it might again convey a double meaning. As a matter of pure grammar, there is force to the argument that the word should be given a double meaning every time it is used, particularly since it is modified by the adjective "such" when it is repeated in the "when lawful" clause.[16]

---

14. If the same descriptive language had been used twice to describe two types of vertical agreements, it would be obvious that the word "resale" had two different meanings. Comparable meaning would be conveyed by a provision describing "(a) agreements prescribing minimum or stipulated prices for the resale of a commodity . . . ., and (b) agreements requiring a vendee to enter into contracts or agreements prescribing minimum or stipulated prices for the resale of a commodity. . . ." In part (a) of such a provision the word "resale" would refer to the first resale whereas in part (b) the same word would refer to a subsequent resale.

15. Alternatively, the word "vendee" might be interpreted as referring to a retailer who purchased from a wholesaler-party to a fair trade contract with the defendant manufacturer. Under that interpretation, the word "resale" would still refer to the sale by the retailer, rather than to the wholesaler's resale.

16. Although Corning argues for a literal interpretation of the clause, it does not expressly suggest that the word "resale" should be given a double meaning. On the contrary, Corning argues that the words "such resale" refer to the first resale the first time they are used in the "when lawful" clause and to the

Under this reading, the word "resale" would have a double meaning every time it is used, and would make the validity of a single agreement between Corning and one of its wholesalers in a free trade state depend upon the law of at least two different states.[17] Although, purely as a matter of literal construction, the word "resale" could be given a consistent double meaning, that reading is certainly not a necessary one. When it is recalled that the original phrasing of the "when lawful" clause as it appeared in the Miller-Tydings Act used the words "such resale" to refer to the first resale by the immediate vendee, it is perfectly reasonable to retain the same construction after the addition of the vendee clause. Indeed, if we were to give the word a double meaning in the "when lawful" clause, we would unnecessarily complicate the statute and broaden the exemption.[18]

The basic purpose of the statute was to exempt certain "contracts or agreements" from the Sherman Act. The statutory language—in both the prohibitory portion of the Sherman Act and the exemptions found in the Miller-Tydings Act and the McGuire Act—focuses our attention on the agreement which is challenged.[19] In this case, that agreement is between a manufacturer and a wholesaler; it restricts the wholesaler's freedom to resell in two ways: first, it establishes the prices at which he may resell and, second, it limits the persons to whom he may resell. It would be anomalous, indeed, for Congress to provide that the lawfulness of the two restrictive clauses in the same agreement should be determined by the law of two different states.[20] It is only logical that the law of the same state should control the legality of the entire fair trade agreement and, further, that the state be the one in

second resale the second time they are used in that clause. It is, however, perfectly clear that any difference in meaning between the first and second portions of the "when lawful" clause—between contracts "lawful . . . in any State . . . in which such resale is to be made" and "lawful . . . in any State . . . to which the commodity is to be transported for such resale"—could not have been intended to have any relevance to the problem presented by this case. For, we reiterate, the vendee clause was not a part of the statute when that language was first enacted. We therefore need not express any opinion on the significance, or possible superfluity, of that clause as applied to situations not before us. *See* the discussion in the Commission opinion, Corning Glass Works, 82 F.T.C. 1675, 1759 (1973). We find neither textual nor historical support for Corning's suggestion that the word "resale" has one meaning when it is used in the first portion of the "when lawful" clause and a different meaning when it is used in the second portion of that clause. If this is not a fair statement of Corning's argument, and if it is really contending that the word refers to the second, rather than the first, resale in both parts of the "when lawful" clause, then the transport clause would be just as superfluous as Corning asserts it to be under the Commission's interpretation; for in that event, the first portion of the "when lawful" clause would compel the result for which Corning contends.

17. The price-fixing clause would be tested by the law of the state where the wholesaler is

located but the customer restriction clause would be tested by the law of the state or states where the wholesaler's customers are located.

18. It is, of course, "common experience that identical words may be used in the same statute, or even in the same section of a statute, with quite different meanings." Wood v. Dennis, 489 F.2d 849, 853 (7th Cir. 1973), cert. denied, 415 U.S. 960, 94 S.Ct. 1490, 39 L.Ed.2d 575, and cases cited therein. We attach greater significance to the Supreme Court's repeated admonition that exemptions from the antitrust laws are to be strictly construed, see, e. g., United States v. McKesson & Robbins, Inc., 351 U.S. 305, 316, 76 S.Ct. 937, 100 L.Ed. 1209; United States v. Philadelphia National Bank, 374 U.S. 321, 348, 83 S.Ct. 1715, 10 L.Ed.2d 915, than to following a nice literal construction which is certainly not compelled by either the history or the purpose of this statute.

19. Moreover, the language of Corning's own agreement purports to make its application to the parties depend upon the law of the place "where it is lawful so to agree." One might expect this language to refer to the place where the agreement at issue was either made or is to be performed rather than to the place where persons who are not parties to the agreement conduct their business.

20. It would be particularly anomalous to have the validity of a customer restriction clause which restrains a wholesaler in free trade state "A"—and merely affects the prices at

which the vendee—in this case the wholesaler—is to make the resales described in the contract.

Corning's construction would allow a manufacturer to impose an otherwise illegal restraint upon a wholesaler in a free trade state because of the fair trade policies in effect in a state where some of his customers are located. Such construction would be inconsistent with the basic explanation of both the Miller-Tydings amendment and the McGuire Act as forms of "state's rights" legislation. Thus, in 1937 Senator Tydings noted that the bill under consideration would simply enable the states "to carry into effect *their own public policy.*"[21]

The Amendment was seen as immunizing contracts in restraint of trade where such contracts were lawful under the fair trade acts of the states "where made or where they are to be performed." S.Rep.No.257, 75th Cong., 1st Sess. 2 (1937). *See also* H.R.Rep.No. 382, 75th Cong., 1st Sess. 2 (1937). The focus was on the immunization of specific contracts and not on the immunization of a series of consensual transactions.

This underlying policy, that a contract's antitrust immunity is to be determined by looking to the law of the state where the contract is executed or to be performed, was reaffirmed in the passage of the McGuire Act. The preamble of the Act provided that its purpose was "to protect the rights of States . . . to regulate their internal affairs."[22] As Representative McGuire, sponsor of the measure, noted,

> This bill is merely an enabling measure. . . . If a State does not believe in price maintenance, it is not forced to tolerate the practice. In the absence of State legislation authorizing price maintenance, the Federal law remains unchanged. *No State need fear any encroachment on its internal affairs by neighboring States pursuing a different policy.* 97 Cong.Rec. 13404–05 (1951) (emphasis added).

Each state has an interest in determining whether its citizens should buy and sell subject to fair trade restraints or free of such restraints. That interest is essentially the same with respect to both types of vertical restraints authorized by the McGuire Act. As Corning recognizes,[23] were it to impose a resale price restriction on resales by its Missouri

---

which retailers may sell in fair trade state "B"—turn on the legality of customer restriction clauses in state "B". Corning's position would be less anomalous if it made the validity of the customer restriction clause in state "A" turn on the legality of the price-fixing section in state "B". There is no way the present statutory language can be so interpreted.

21. "[I]t should be observed, in the first place, that the bill under consideration is simply an enabling act. It permits the States, without the complications of possible violation of Federal law, to carry into effect their own public policy, and it is limited to a specific type of legislation now on the statute books of 27 States.

"These State laws are applicable only to transactions consummated wholly within the borders of the State in which the legislation is in effect, that is to say, they apply only to sales made by one person to another within the territorial confines of the State." Hearings on S. 100 before the Subcommittee of the Senate Committee on the Judiciary, "Resale Price Maintenance," 75th Cong., 1st Sess. 42 (1937).

22. "That it is the purpose of this Act to protect the rights of States under the United States Constitution *to regulate their internal affairs* and more particularly to enact statutes and laws, and to adopt policies, which authorize contracts and agreements prescribing minimum or stipulated prices for the resale of commodities and to extend the minimum or stipulated prices prescribed by such contracts and agreements to persons who are not parties thereto. It is the further purpose of this Act to permit such statutes, laws, and public policies to apply to commodities, contracts, agreements, and activities in or affecting interstate or foreign commerce." 66 Stat. 631–632; 15 U.S.C. § 45 ("Purpose of Act July 14, 1952") (1970) (emphasis added).

23. "Corning does not in any way fix the price at which the Missouri wholesaler resells the merchandise to any customer. The Missouri wholesaler determines the price at which he sells to any of his customers—including an Illinois retailer. . . ." Brief for Petitioner at 26.

wholesaler, such a contract provision would violate the antitrust laws.[24] Missouri is a free trade state; Missouri's public policy is not to immunize price restrictions placed on the sales of goods by Missouri merchants. It is equally clear that Missouri has not immunized customer restrictions placed on the sale of goods by Missouri merchants.[25]

Corning incorrectly assumes that the significance of the vendee provision in its fair trade contract with wholesalers is limited to price maintenance in fair trade states.[26] But even if maintaining the retail price may be the ultimate purpose of the vendee clause, it is clearly not the clause's only effect. The clause seriously restricts the Missouri wholesaler's freedom of choice in selling to retailers located in neighboring fair trade states. Thus, the clause imposes a restraint of trade in Missouri, and is inconsistent with Missouri public policy. To paraphrase Representative McGuire, a state like Missouri should not be forced to tolerate a practice which its own public policy does not condone; it should not be subjected to encroachment on its internal affairs by neighboring states pursuing a different policy.[27]

The Commission's interpretation of the "when lawful" clause fully respects the public policies of the three classes of states.

a. In free trade states, the policy of preventing restraints of trade is fully vindicated. Neither a vertical price-fixing clause nor a customer restriction clause contained in a contract governing the resale in the free trade state is exempt from the antitrust laws.

b. In signer-only states, the policy of permitting vertical restraints of trade which are voluntarily assumed by contracting parties while prohibiting the imposition of involuntary restraints on non-

24. Thus, where a Washington, D.C., wholesaler sold fair traded goods to a New York retailer for resale in New York, the New York fair trade act determined the antitrust immunity of price maintenance provisions. *See* Mead Johnson & Co. v. G-E-X, Inc. of Albany, 37 Misc.2d 491, 496–497, 235 N.Y.S.2d 951, 956–957 (Sup.Ct.1963). Where, however, a Washington, D.C., establishment sold fair traded goods directly to consumers in Maryland and New York, the manufacturers were unable to rely on the fair trade acts of those states to impose resale price maintenance. The fair trade public policy of the District of Columbia, where the resale at issue took place, governed. *See* General Electric Co. v. Masters Mail Order Co., 244 F.2d 681, 684 (2d Cir. 1957), cert. denied, 355 U.S. 824, 78 S.Ct. 32, 2 L.Ed.2d 39; Revere Camera Co. v. Masters Mail Order Co., 128 F.Supp. 457 (D.Md. 1955).

25. It is clear that, absent statutory exemption, such a customer restriction clause would violate the federal antitrust laws.

"A distributor of a trade-marked article may not lawfully limit by agreement, express or implied, the price at which *or the persons to whom its purchaser may resell,* except as the seller moves along the route which is marked by the Miller-Tydings Act." United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 721, 64 S.Ct. 805, 812, 88 L.Ed. 1024 (emphasis added).

The Commission concluded that such customer restriction clauses would also be unlawful as a matter of state law in free trade states. 82 F.T.C. 1675, 1754 n. 9 (1973). Corning has not disputed this conclusion.

26. As Corning states at page 28 of its brief, "Since the only purpose of the vendee provision in Corning's Wholesaler Fair Trade Agreement is to effectively maintain the price in the second resale, it follows that we must look to the law of the state in which the second resale occurs to determine the propriety of the vendee provision."

27. Amicus Rubbermaid, Inc., argues that since goods shipped from a free trade state become subject to fair trade control upon arrival for resale in a fair trade state, "it opposes logic to invest the shippers with [fair trade control] immunity on the basis of their geographic locations." Brief for Amicus at 19 n. 14. What Rubbermaid ignores is that the determination of the antitrust immunity of an eventual price restriction upon resale in a fair trade state is logically separate from the determination of the immunity of a contractual vendee clause that imposes a serious restraint on the free selection of customers by a free trade state wholesaler. Congress' express desire to immunize specific "contracts" should not be broadly read to mean the immunization of a series of contracts simply because the end result, price maintenance, is sanctioned by a state fair trade law.

contracting parties is fully vindicated. In those states Corning may continue its price maintenance program to the extent that it is able to persuade retailers to enter into price-fixing agreements voluntarily and to induce wholesalers in those states to accept customer restriction clauses in their contracts. But Corning may not restrain the freedom of a non-signing retailer to purchase from accessible wholesalers in neighboring free trade states by imposing customer restriction clauses on such wholesalers. The involuntary restraint resulting from such a clause would offend the policies of both the free trade state and the signer-only state.[28] As the Commission noted, the fact that signer-only states no longer have or enforce non-signer legislation reflects their desire to protect non-signing merchants from involuntary restraints. It would be inconsistent with that interest to deny those retailers the right to purchase from wholesalers in free trade jurisdictions free of any restraint which they had not voluntarily accepted.

c. In non-signer states, Corning's fair trade program is essentially unimpaired.[29] Even though non-signer state retailers may now obtain goods from free trade state wholesalers without first contracting with Corning, they may not lawfully sell these items below the fair trade price. (See, e. g., § 2 of the Illinois Fair Trade Act, supra n. 5). Corning may continue to insist on vendee clauses in its contracts with non-signer state wholesalers, as such clauses are lawful under the fair trade acts of all non-signer states.

In sum, we agree with the Commission's interpretation of the McGuire Act; the exemption of a customer restriction clause in a wholesaler contract depends on the law of the state in which the resale of the product by the wholesaler to the retailer takes place. This interpretation fully respects the public policies of all three types of jurisdictions and accords with the basic federal "policy in favor of competition." Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974).

### III.

■ With respect to the Order issued by the FTC in this case, Corning argues that it was not given an adequate opportunity to be heard on the terms of the final order. We disagree.

The Commission's Complaint, issued January 13, 1972, was accompanied by a proposed order, described in the accompanying Notice as "the form of Order which the Commission has reason to believe should issue if the facts are found to be as alleged in the Complaint." The Motion for Summary Decision filed by complaint counsel sought "that the order to cease and desist proposed by the Commission be entered against Respondent." This motion was served on October 2, 1972, some eight months after the issuance of the Complaint. Corning did not attack the proposed order, even

28. In Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035, the Court recognized a comparable distinction between "price fixing by contract or agreement" and "price fixing by compulsion" (p. 388, 71 S.Ct. 747), or between "coercive" and "voluntary" schemes or arrangements (p. 394, 71 S.Ct. 745).

29. We recognize that as a practical matter a fair trade program in a non-signer state may be impaired to the extent that a manufacturer is unwilling to assume the litigation costs associated with enforcement, particularly since such costs include the risk that a non-signer state will be judicially changed into a signer-only state, as recently occurred in North Car-

olina. Bulova Watch Co., Inc. v. Brand Distributors of North Wilkesboro, Inc., 285 N.C. 467, 206 S.E.2d 141 (1974). Although possible infirmity in the state of the law in a non-signer jurisdiction may provide a legitimate explanation for a manufacturer's decision to avoid litigation and to use customer restriction clauses as a method of enforcing its fair trade program, such possible infirmity is not a factor we may properly assess in considering the impact of our holding in a non-signer jurisdiction. For, if the test of litigation would disclose that some jurisdictions are improperly classified as non-signer states, the policy considerations applicable to free trade and signer-only states should be respected in those states.

though complaint counsel's motion sought a complete disposition of the case. Only in its Motion for Reconsideration, filed after the Commission's decision, did Corning contest the form of the Order. While concluding that Corning's contentions were not timely, the Commission nevertheless considered, and rejected, the merits of Corning's arguments. We feel that Corning was given an ample opportunity to be heard on the propriety of the Order.

Corning, finally, contends that the Order is "unnecessarily punitive" in three respects. It objects to the requirements that it mail a copy of the Order to all retailers in the 14 non-signer fair trade states, that it "encourage" its signer-only state retailers to ignore Corning's fair trade prices, and that it refrain for three years from the use of pre-priced product containers and the use of fair trade prices in advertisements in areas where Corning may not lawfully control resale prices.

■ The Commission must be accorded broad discretion in framing its orders to insure the effective termination of any violation. As we stated in L. G. Balfour Co. v. F.T.C., 442 F.2d 1, 23 (7th Cir. 1971),

It is well settled that the choice of the remedial order is committed to the discretion of the Commission. F.T.C. v. Mandel Bros., Inc., 359 U.S. 385, 392–393, 79 S.Ct. 818, 3 L.Ed.2d 893 (1959); Niresk Industries, Inc. v. F.T.C., 278 F.2d 337, 343 (7th Cir. 1960), cert. denied, 364 U.S. 883, 81 S.Ct. 173, 5 L.Ed.2d 104 (1960). Except where the remedy selected bears no reasonable relation to the unfair practices found to violate Section 5, the courts will not reverse or modify the Commission's choice. F.T.C. v. National Lead Co., 352 U.S. 419, 428–429, 77 S.Ct. 502, 1 L.Ed.2d 438 (1957); National Bakers Services, Inc. v. F.T.C., 329 F.2d 365, 367 (7th Cir. 1964).

■ The Commission has met these requirements. While the retailers in the 15 non-signer states will still be required to maintain the fair trade retail prices for Corning's products, they now may purchase those products from free trade state wholesalers at non-fixed prices.[30] Thus, by requiring Corning to inform these retailers of the FTC Order, the Commission furthers the goal of removing the vestiges of past Corning violations.

Similarly, the FTC decision may open a significant source of supply for retailers in signer-only states who do not wish to maintain the fair trade price. Some of those retailers who signed fair trade contracts with Corning may have acted under the compulsion of the illegal Corning customer restriction clause in the free trade state wholesale contracts. The Commission could reasonably conclude that the most effective way to abolish the effects of this violation is to inform those signer-only state retailers whose fair trade contracts were submitted through free trade state wholesalers that "unless and until [they] enter into new retailer contracts, [they] may and are encouraged to" sell Corning's merchandise at such prices as they wish. This is what the FTC order requires.

We also agree with the Commission that any practical problems Corning may have in preventing the use of pre-marked containers and fair trade priced advertisements in areas where Corning may not lawfully fix prices are best resolved as a compliance matter, rather than by revising the language of the Order.

■■ Finally, we note Corning's challenge to the impartiality of the Commission because of its consistent opposition to resale price maintenance in general and legislative exemptions from the antitrust laws for this form of pricefixing in particular. There is no merit to this challenge. It is certainly proper for the

---

**30.** This relief was ordered based on the violation alleged in Count I of the Complaint. *See* n. 7, *supra*. The parties had stipulated prior to the FTC decision that if a violation were found on Count II, relief could be ordered on Counts I and IV as well.

Commission to express the consumer point of view when antitrust amendments, or exemptions, are being considered by the Congress. Its performance of that public service in no way qualifies its status as an independent agency entitled to our respect in the discharge of its quasi-judicial functions. Moreover, contrary to Corning's argument, the views of complaint counsel as reported in the press certainly may not be used as a basis for questioning the independence of the members of the Commission itself. Indeed, we think our interpretation of the statute is strongly buttressed by the fact that it accords with the expert and experienced views of the agency charged with administration of the statutory scheme of which the McGuire Act is a part.[31]

Accordingly, we affirm and enter judgment enforcing the order of the Federal Trade Commission.

---

31. *See, e. g.,* Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616, and cases cited therein.